Argued November 10, 1954, affirmed February 9, petition for
rehearing denied March 9, 1955

# LANDGRAVER *v.* EMANUEL LUTHERAN
# CHARITY BOARD, INC.

280 P. 2d 301

*W. A. Franklin* argued the cause for appellant. On the brief were Anderson, Franklin & Landye, of Portland.

*James Arthur Powers,* of Portland, argued the cause for respondent. With him on the brief was Earle P. Skow, of Portland.

Leo Levenson, Maurice D. Sussman, Hess & Hess, Burl L. Green, Hicks, Davis & Tongue, Anthony Pelay, Jr., Norman L. Easley, Krause & Evans, Peterson & Pozzi, Uney & Jacobs, Schwenn & Brink, S. H. Burleigh, McAllister, Duncan & Brophy, William Walsh, U. S. Balentine, and Paul R. Harris, filed a brief as Amici Curiae.

TOOZE, J.

This is an action for damages for personal injuries caused by alleged negligence, brought by Larry Landgraver, as plaintiff, against Emanuel Lutheran Charity Board, Inc., a corporation, as defendant. Judgment on the pleadings was entered in favor of defendant. Plaintiff appeals.

The judgment on the pleadings was granted by the trial court upon the theory that a charitable institution, such as the defendant, was immune to tort liability.

The parties are agreed that the defendant is a charitable corporation, organized under the appropriate laws of this state, and that its funds and income are perpetuated in trust to carry on the charitable purposes for which it was created.

The parties also agree that under the existing law of this state, as announced in prior decisions of this court, the defendant is immune to the tort liability sought to be fastened upon it by the instant litigation. But the plaintiff insists that, in the light of modern conditions, we should re-examine the question of tort liability as it applies to charitable institutions, and adopt a new rule holding them liable for damages for their negligent acts. That presents the only matter before us for decision.

We have, therefore, re-examined the question. Some courts of high repute, including the Supreme Court of our sister state of Washington, have also done the same thing, and in many instances have, in the light of changed conditions, overturned the rule of immunity, expressly overruling their prior decisions in which the doctrine was recognized. This was true with the Supreme Court of Washington: *Pierce v. Yakima Valley Memorial Hospital Ass'n.*, 43 Wash 2d 162, 260 P2d 765. For a complete discussion of the doctrine of immunity to tort liability enjoyed by charitable institutions, and of the trend of recent court decisions, see Note 25 ALR2d 29. Many sound reasons are given for abrogating the rule of immunity, particularly as it applies to charitable corporations engaged in big business, such as hospitals. Not the least of those reasons is the availability of insurance in this modern age to cover the risks.

■■ The rule of immunity as applied to charitable organizations was established in this state as a matter of public policy. The term "public policy" is not susceptible to an exact or precise definition. Generally, it is said to be that principle of law which holds that no one can lawfully do that which has a tendency to be

injurious to the public or against the public good (72 CJS 209, Policy). It varies with the times, and the public policy at one time may not be the public policy of another time. In *Turney v. J. H. Tillman Co.*, 112 Or 122, 132, 228 P 933, we said:

"By reason of the fact that the habits, opinions, and wants of the people vary with the times so public policy may change with them. So because these habits, opinions and wants are different in different places, what may be against public policy in one state or country may not be so in another: 13 C.J. 427, § 363."

Primarily, it is the function of the legislature to establish the public policy of the state; it is the duty of the courts to recognize it like any other matter of public law. However, cases may arise covering a field where no direct legislation exists. In such cases, it is for the courts to ascertain and declare what is the public policy of the state. Many factors enter into that consideration. The state's public history, its constitution, its legislation upon kindred subjects, its court decisions, and, in some cases, the constant practices of state officials, are all matters to be considered. But once the court has ascertained and declared that public policy, it becomes the law of the state, and is as binding as a legislative enactment. *Bigelow v. Old Dominion Copper Mining & Smelting Co.*, 74 NJ Eq 457, 71 A 153, 174; *Picket Pub. Co. v. Board of Com'rs.*, 36 Mont 188, 92 P 524, 13 LRANS 1115, 12 Ann Cas 986, 122 Am St Rep 352; *Cruse v. Fischl*, 55 Mont 258, 175 P 878; *Pike v. State Board of Land Com'rs.*, 19 Idaho 268, 113 P 447, 453, Ann Cas 1912B, 1344; *Perry v. United States School Furniture Co.*, 232 Ill 101, 83 NE 444; *Clough v. Gardiner*, 182 NYS 803, 111 Misc 244; *In re Lampson's Will*, 53 NYS 531, 33 App Div 49.

■ From the beginning, the overriding public policy of this state, as evidenced by many legislative acts, has been to protect the assets of charitable institutions from use for any purpose other than that for which they were organized. The legislation of the state exempting such institutions from taxation is one example of the legislative policy.

Exempting charitable organizations from tort liability is but another phase of that same public policy. This court did not establish that policy in this state; it simply declared what it was in the light of the general public policy established by the legislature. Since its first opportunity to discuss the policy as it concerned the question of immunity from tort liability in the case of *Hill v. Tualatin Academy* (1912), 61 Or 190, 121 P 901, this court has been consistent in approving the doctrine of immunity in general, although it has discussed some exceptions: *Gregory v. Salem General Hospital* (1944), 175 Or 464, 153 P2d 837; *Hamilton v. Corvallis Hosp. Ass'n.* (1934), 146 Or 168, 30 P2d 9; *O'Neill v. Odd Fellows Home* (1918), 89 Or 382, 174 P 148. Also see *Wickman et al. v. Housing Authority*, 196 Or 100, 247 P2d 630. In the Gregory case, our prior decisions were reviewed; we also recognized the attacks made in that litigation upon the doctrine that a hospital is exempt from liability for its negligence. But in the final analysis, we refused to repudiate the rule. We also suggested that a change in the rule, if a change was to be made, was a matter for legislative determination, and not one for the court.

Over the years the legislature has taken no action to overturn the doctrine. By its silence, we may well infer its approval. But, however that may be, there was no occasion for it to act specifically if it was satisfied with the rule. The doctrine had become the firmly

established law of this state; a part of the general public policy of the state relating to charitable institutions, and as established by the legislature.

The legislature had the right to assume that the rule would not be changed unless it itself acted.

■ We are divided in this court as to the proper course that should be taken. Whatever a divided court may decide today may be changed tomorrow, if there happens to be a change in the personnel of the court, or a change of opinion on the part of members of the court as now constituted. The matter is of the highest importance to every charitable institution in Oregon, including hospitals, churches, private schools, organizations such as the Y.M.C.A., Salvation Army, and other charities, as well as to the public at large. In such circumstances, it seems clear that any change in the public policy of this state should be a matter solely for legislative determination.

Judgment affirmed.

LUSK, J. (specially concurring).

I concur in the judgment of affirmance but solely on the ground that the plaintiff was a patient in the hospital operated by the defendant. I find no legislation in this state touching the subject. The immunity is purely court made and is said to be a part of the public policy of Oregon. But public policy "is a very unruly horse, and when you once get astride it you never know where it will carry you." Burrough, J., in *Richardson v. Mellish,* 2 Bing 229, 252. The opinion of the court in the case at bar expresses a policy of total immunity for charitable corporations from tort liability. I think that this is wrong and that the dissenting opinion of Mr. Justice BRAND demonstrates that it is wrong. I am unwilling to be carried so far as to concur in a

holding, for example, that a person injured on a public thoroughfare as the result of the negligent operation of an ambulance by the employee of a charitable corporation operating a hospital is without redress against the corporation. That, of course, is not this case. But the language of the opinion could be invoked to support such a ruling. We have held that a patient in a hospital cannot recover against the institution for a tortious injury suffered at the hands of its employees. That is as far, in my judgment, as the public policy goes. That, likewise, is the extent of the immunity (where immunity prevails) under the weight of authority in this country. 3 Scott on Trusts 2151; ALI Restatement, Trusts, p. 1240. I would limit the decision strictly to the issue presented by the pleadings in this case.

BRAND, J., dissenting.

I am authorized to state that Mr. Chief Justice WARNER joins in the following dissent.

The plaintiff sued the defendant hospital for negligent injury to his person. Judgment on the pleadings was entered for the defendant, and the plaintiff appeals. The complaint alleges that the Emanuel Lutheran Charity Board, Inc., a corporation, was negligent in administering a blood transfusion with infected and contaminated blood and by means of a contaminated needle, blood container and hose. We shall assume that the complaint would be sufficient if directed against a private corporation operating a hospital for profit. The answer alleges, and the amended reply admits, that the defendant "is a non-profit organization, organized under the non-profit laws of the State of Oregon, and as such is a charitable institution and conducts the hospital referred to in plaintiff's complaint as a charitable institution, and that its funds and income are

perpetuated in trust to carry on the charitable purposes for which it is organized." As an affirmative reply, plaintiff alleges that:

"defendant Emanuel Lutheran Charity Board, Inc., a corporation, for some time prior to and at all times mentioned in plaintiff's complaint was covered by a policy of insurance indemnifying it against liability for torts committed by it arising out of its operation of the Emanuel Lutheran Charity Board, Inc.; that said policy of liability insurance was in full force and effect at all times mentioned in plaintiff's complaint and if judgment is recovered in this cause, then judgment will be paid by an insurance company under the terms of its said policy and such judgment will not be paid out of any funds held in trust for the use of the alleged charitable trust fund and will in no way diminish the trust fund or income of the defendant as in its said answer set forth."

Judgment on the pleadings was granted on the theory that the defendant was immune to liability and that the allegations concerning insurance were irrelevant and prejudicial. The only assignment of error relates to the granting of the motion for judgment on the pleadings.

For a second time this court has been requested to reconsider its holdings on the question of liability of charitable corporations. Briefs by the plaintiff and by a considerable group of lawyers, as amici curiae, urge upon us that the rule of immunity is archaic, unjust, unworkable, and contrary to the modern trend of authority. We are cited to an exhaustive annotation of 170 pages in 25 ALR2d, 29 to 200, which was published in 1952, more than seven years after the date of our last decision on the subject. The annotation was made "Because of recent developments in the law on the subject * * *." Since our last decision adhering to the immunity doctrine, persuasive judicial opinions have

been written. A decent respect for the able presentation of the issue and for recent authority suggests a consideration of the reasoning which supports or opposes charitable immunity. The early British decisions which gave rise to the theory of immunity have been overruled, but the doctrine of immunity persists in a number of American jurisdictions.

Twelve state jurisdictions have been listed as supporting the rule of total immunity to liability for tort. Since Oregon is included in this list, we will examine the decisions which belong to it. The courts of Arkansas, Kentucky, Maine, Maryland, Massachusetts, Missouri, Pennsylvania, South Carolina and Wisconsin apparently support this rule. 25 ALR2d 79, § 18. Illinois has been classed with this group (*Parks v. Northwestern University*, 218 Ill 381, 75 NE 991 (1905)), but the rule in that state has been modified by *Moore v. Moyle*, 405 Ill 555, 92 NE2d 81 (1950). Kansas has also been listed in this group, but it has recently overruled previous decisions, and now holds charities liable for tort. *Noel v. Menninger Foundation*, 175 Kan 751, 267 P2d 934 (1954). Pennsylvania has adhered to the view of total immunity, but see severe criticism of the rule and refusal to follow it in *De Fraites v. Young Men's Christian Association*, 49 D&C 652 (1943). South Carolina has carried the immunity rule to its ultimate conclusion by holding, on the grounds of public policy, that an employee injured through the negligence of a charity cannot avail himself of the benefits of the Workmen's Compensation Law, which is a legislative declaration of public policy. *Caughman v. Columbia YMCA*, 212 SC 337, 47 SE2d 788 (1948).

As opposed to these decisions, the following cases hold that charitable corporations are liable for their torts: *Ray v. Tucson Medical Center*, 72 Ariz 22, 230

P2d 220 (1951), in which decisions to the contrary were expressly overruled; *Malloy v. Fong,* 37 Cal2d 356, 232 P2d 241 (1951), in which cases to the contrary were overruled; *Durney v. St. Francis Hospital,* 7 Terry 350 (Del Civ App), 83 A2d 753 (1951); *President and Directors of Georgetown College v. Hughes,* 130 F2d 810; *Nicholson v. Good Samaritan Hospital,* 145 Fla 360, 199 So 344 (1940); *Haynes v. Presbyterian Hospital,* 241 Iowa 1269, 45 NW2d 151 (1950), cases to the contrary overruled; *Noel v. Menninger Foundation,* supra (1954), overruling previous cases; *High v. Supreme Lodge of the World,* 214 Minn 164, 7 NW2d 675. See *Geiger v. Simpson Methodist Episcopal Church,* 174 Minn 389, 219 NW 463, 62 ALR 716; *Welch v. Frisbie Memorial Hospital,* 90 NH 337, 9 A2d 761; *Rickbeil v. Grafton Deaconess Hospital,* 74 ND 525, 23 NW2d 247 (1946); *Glavin v. Rhode Island Hospital,* 12 RI 411 (1879); *Mississippi Baptist Hospital v. Holmes,* 214 Miss 906, 55 So2d 142 (1951); *Sessions v. Thomas D. Dee Hospital Association,* 94 Utah 460, 78 P2d 645 (1938); *Foster v. Roman Catholic Diocese of Vermont,* 116 Vt 124, 70 A2d 230 (1950); *Pierce v. Yakima Valley Memorial Hospital Ass'n,* 43 Wash2d 162, 260 P2d 765 (1953).

It will be observed that nine of the cases cited were decided since the date of our last decision on the subject, and that in five jurisdictions the courts have reconsidered the issue, overruled previous decisions and held charities liable for tort and that, since our last decision.

The gradual erosion of the rule of immunity has been demonstrated in the decisions of many jurisdictions which have in the past been listed as supporting immunity on the grounds of public policy or on the trust fund theory. Decisions in 15 jurisdictions which have denied recovery to beneficiaries, have nevertheless

held that charities are liable in damages for negligent injury of strangers. The cases are listed in 25 ALR2d pp 91 to 93, § 23.

The view that immunity does not extend to a tort committed against a servant of the charity has been supported in eight jurisdictions. 25 ALR2d pp 89 to 90, § 22. In eight jurisdictions decisions have been rendered tending to indicate an abandonment of the immunity theory in its entirety, and holding that a charitable institution is liable for a tort committed against a paying patient, as distinguished from one who receives treatment without cost. 25 ALR2d 106, 107.

In Tennessee the rule has been limited by a decision holding that the immunity doctrine does not apply if the charity is guilty of creating a nuisance. *Love v. Nashville Agricultural & Normal Institute,* 146 Tenn 550, 243 SW 304, 23 ALR 887. Concerning this rule the editors of ALR comment as follows:

"* * * It is paradoxical, to say the least, that, in weighing the property interests of a charity against the interests of a victim of its tortious acts, some courts value the property interests of the victim more highly than his interest in life and limb, and hence allow him to recover for damage caused to his property by the charity's maintaining a nuisance, but refuse such recovery where personal injury or death results from the charity's tortious acts." 25 ALR2d 43, Anno: Charity, Tort Liability, Immunity, § 3.

In the jurisdictions supporting it, the immunity doctrine has generally been held to mean immunity from suit, but in four jurisdictions it has been held that the plaintiff may bring suit and recover judgment against a charity but that trust funds are immune from execution. By reason of the gradual trend away from

the immunity doctrine, many states have been listed in from two to four different decision groups. Oregon is listed in three, by the editors of American Law Reports.

A recent Vermont case, in rejecting the immunity doctrine, said:

"* * * Every reason advanced and ground used has been vulnerable to attack and criticism and there has been no lack of it. When we look to decisions in other jurisdictions for enlightenment we are confronted with an irreconcilable conflict of reasoning and result." *Foster v. Roman Catholic Diocese of Vermont,* 116 Vt 124, 70 A2d 230, 232.

The Nevada Supreme Court referred to the decisions of a different jurisdiction and said:

"The court in the opinion mentioned admits that it has misgivings as to the soundness of the trust fund rule, but does not seem prepared to break away from the fetish worship which influenced so many courts." *Bruce v. Young Men's Christian Ass'n,* 51 Nev. 372, 277 P 798, 801.

An exhaustive review of the authorities is to be found in the able opinion of Justice Rutledge, where it is said:

"It is doubtful that the so-called 'rule' of full immunity ever represented the prevailing state of decision in this country. * * *" *President and Directors of Georgetown College v. Hughes,* 130 F2d 810, 817.

Turning from the enumeration and classification of cases, we next consider the principles involved.

## THE TRUST FUND THEORY

The theory supporting this doctrine is that the funds of a charity are held in trust, the diversion of which the courts will not permit for one or more of the

following reasons: (1) It might result in destroying or substantially impairing the usefulness of charitable institutions; (2) the donors' intent would be thwarted; (3) since it is beyond the power of the trustees to divert trust funds directly, they cannot do so indirectly. See cases cited 25 ALR2d, pages 60 to 61.

Recently the trust fund doctrine has been the object of severe and logical criticism. Courts which favor, as well as those which oppose the immunity doctrine, recognize that the real issue is one of public policy and that the trust fund doctrine is merely an application of a general public policy within the jurisdiction.

> "While the cases seem to treat the two theories, trust fund and public policy, under separate heads, the distinction between them is more apparent than real. At bottom they are the same, the trust fund doctrine being, as some of the cases say, the 'child' or 'offspring' of the doctrine public policy. * * * The Virginia Supreme Court of Appeals in the St. Vincent Hospital case, supra, aptly stated the matter thus: 'The determination of a number of courts * * * that there should be absolute immunity in all cases, and which came to be known as the "trust fund theory," was nothing more than saying that the immunity was granted from reasons of public policy; that on the whole the public would be best served by the application of this theory.' * * *" *Dille v. St. Luke's Hospital,* 355 Mo 436, 196 SW2d 615, 620.

In that case the immunity doctrine was upheld.

In *Silva v. Providence Hospital of Oakland,* 14 Cal2d 762, 97 P2d 798, the charity was held liable for the negligence of its agent. The court pointed out that "the most severe criticism of the trust fund theory is that, if logically applied, the property of the charitable organizations must enjoy complete immunity from all

claims, regardless of the status of the injured plaintiff. * * *''

In *Foster v. Roman Catholic Diocese of Vermont,* supra, the court said:

"On principle it would seem that a charitable trust is either exempt from liability for negligence in all cases or none. Nicholson v. Good Samaritan Hospital, supra. The Supreme Court of Nevada in Bruce v. Y.M.C.A., 51 Nev. 372, 277 P. 798, 802, in a brilliant analysis, flatly repudiates the trust fund theory, stating in part: 'A flood of cases might be cited holding that a charitable institution is liable for its negligence in the selection of its employees, for the negligence of its employees to strangers, or for some other reason. Every decision so holding, no matter how astutely the court may seek to evade the real question—that is, the charitable trust theory—is in fact, where the question is presented, a denial of that doctrine, for, as we have said, in substance, a charitable institution is either exempt or it is not.. No sophistry, no refinement of argument, can consistently hold that a charitable institution is exempt in the one case and not exempt in the other.' "

To the same effect see *Nicholson v. Good Samaritan Hospital,* 145 Fla 360, 199 So 344; 133 ALR 809.

Among the cases which pay lip service to the trust fund doctrine, or which uphold immunity on the general ground of public policy for the protection of a charity, we have found decisions authorizing recovery by paying-patients, by employees, and by strangers. In the state of Washington, two exceptions to the rule of immunity have been recognized. In that jurisdiction it was held that a charity is liable for failure to exercise due care in the "nondelegable duty of selecting proper physicians and nurses * * *.'' It also held that a charity is liable for failure to furnish proper equipment, if

damages result therefrom. The court drew a distinction between administrative negligence for which the charity is liable, and the negligence of a servant in performing his professional duties for which it is not liable. *Miller v. Sisters of St. Francis*, 5 Wash2d 204, 105 P2d 32. The failure to furnish a proper bassinet for a new born baby constituted administrative negligence, for which liability was imposed. It is difficult to understand why, under the trust fund theory, a charity should be liable for failure to furnish a proper bassinet, but not liable for failure to use one.

In a few jurisdictions the courts have by-passed their own doctrine of immunity by permitting recovery to a paying-patient if he waives the tort and sues in assumpsit, although the facts alleged would give rise to an action of tort but for the immunity rule. All of these exceptions to the immunity doctrine are utterly inconsistent with the trust fund theory on which immunity is predicated. They are also inconsistent with a theory of immunity based on the general ideas of public policy. A few cases have held that suits for negligence may be brought against a charity and a judgment obtained, but that there can be no levy of execution against trust funds. See 133 ALR 819. These cases are also inconsistent with immunity, so far as legal liability is concerned.

The argument against the theory of immunity begins with the familiar constitutional provision that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." Constitution of Oregon, Article I, § 10. A similar provision was invoked in the Nicholson case supra, where the court said:

"Thus it would appear that public policy of this state, as enunciated by its Constitution, is to put

justice 'by due course of law' above or before charity. * * *'' *Nicholson v. Good Samaritan Hospital*, 145 Fla 360, 199 So 344; 133 ALR 809, 815 (1940).

''* * * It is a trite saying that charity begins at home. It may reasonably be said that charitable institutions must first fairly compensate those who are injured and damaged by the negligence of their officers and servants in the conduct of the affairs of such institutions before going farther afield to dispense charity and do good. Men and corporations alike are required to be just before being charitable. Charitable, benevolent, and religious institutions have been and are doing immeasurable service for the physical and moral welfare of humanity. Such institutions are rapidly growing in number, in resources, and influence. They should be encouraged, aided, and protected in carrying on their work to the full extent that it may be done without injustice to others. They are generally favored by being relieved, partly or wholly, from the burden of taxation. We do not think it would be good public policy to relieve them from liability for torts or negligence. Where innocent persons suffer through their fault, they should not be exempted. That rule, in the long run, will tend to increased efficiency and benefit them and the public, as well as persons so injured. It is almost contradictory to hold that an institution organized to dispense charity shall be charitable and extend aid to others, but shall not compensate or aid those injured by it in carrying on its activities.

''No question of diversion of trust funds is presented in this case. In any event, that theory has been so weakened and limited by the decisions that it is not likely to hereafter have much practical application or importance.'' *Geiger v. Simpson M.-E. Church*, 174 Minn 389, 219 N.W. 463; 62 ALR 716, 721. And see *Sheehan v. North Country Community Hospital*, 273 NY 163, 7 N.E.2d 28; 109 ALR 1197.

The following courts reiterate the proposition that a charitable institution should be just before it is gen-

erous. *Ray v. Tucson Medical Center,* supra, 72 Ariz 22, 230 P2d 220, 229; *Silva v. Providence Hospital of Oakland,* supra, 14 Cal2d 762, 97 P2d 798; *Tucker v. Mobile Infirmary Association,* 191 Ala 572, 68 So 4.

The view that sound public policy requires that charities should answer in damages for their torts is persuasively set forth in *President and Directors of Georgetown College v. Hughes,* supra, 130 F2d 810, 812 (opinion by Judge Rutledge), as follows:

"We start with general principles. For negligent or tortious conduct liability is the rule. Immunity is the exception. Human beings ordinarily are responsible for their own legally careless action. They respond also for negligent harms inflicted by their agents and employees. So do business corporations. Likewise trustees and other fiduciaries generally are liable for their own negligence in administration and operation of the business or property committed to their control. Respondeat superior more and more has made them, as it has private corporations, responsible for wrongs done by their inferior functionaries.

"Generally also charity is no defense to tort. For wrong done, it is no answer ordinarily to say, 'He did not pay and was not bound to pay for the service. I gave it to him.' One who undertakes to aid another must do so with due care. Whether the Good Samaritan rides an ass, a Cadillac, or picks up hitchhikers in a Model T, he must ride with forethought and caution. * * *"

Similar considerations were advanced by the Iowa court in *Haynes v. Presbyterian Hospital Association,* supra, 241 Iowa 1269, 45 NW2d 151 at 154 (1950). The court said:

"The law's emphasis generally is on liability, rather than immunity, for wrongdoing. Charity is generally no defense. It is for the legislature, not the courts, to create and grant immunity. The fact

that the courts may have at an early date, in response to what appeared good as a matter of policy, created an immunity, does not appear to us a sound reason for continuing the same, when under all legal theories, it is basically unsound and especially so, when the reasons upon which it was built, no longer exist.

"It is our considered judgment that incorporated charity should respond as do private individuals, business corporations, and others, when it does good in the wrong way. * * *"

(Previous decision overruled.)

It appears incongruous in the light of modern social theory, to hold, as many courts have done, that a hospitalized patient who is able to pay and does pay, for services, can recover for personal injuries, but that a person who is so in need of charity that he cannot pay, is also the one who cannot even recover compensation if he is negligently injured. It would seem that if one is deserving of charity, he should be at least deserving of justice. If he were found by the roadside, wounded, or broken, the institution would care for him, we are told, without charge; but if he is wounded or broken in the hospital, he would have no redress. Is it too much to say that compensating such a person is, in itself, a charitable purpose, especially when the compensation goes no further than is required of all other persons who cause negligent injury? And considering the purpose to which charitable funds are devoted, one might well ask, is it not as charitable for an institution to compensate one who has been injured by its own negligence as it is to bestow the same funds upon some other unfortunate who was injured by a stranger?

The courts have repeatedly pointed out that the early cases which followed the rule of nonliability were considered under conditions which no longer prevail.

The later decisions which still adhere to the ancient doctrine are strangely lacking in any supporting argument, except that which is drawn from the doctrine of stare decisis. The courts have taken judicial notice that charity hospitals and like institutions have become big business. They are not merely the invested wealth of some benevolent donor. They are supported in part by community drives for funds. They pay reasonable salaries, and, to a preponderant extent, their charges approach the limit of what the traffic will bear. In *Haynes v. Presbyterian Hospital Association,* supra, the court said:

"Today, the situation is vastly different. The hospital of today has grown into an enormous business. They own and hold large assets, much of it tax free by statute, and employ many persons. The state has become paternal to an astonishing degree, as evidenced by numerous statutes found in our code, such as; Chap. 250, Relief for soldiers, sailors and marines; Chap. 252, Support for the poor; Chap. 253, County homes; Chap. 254, Indigent tuberculous patients; Chap. 255, Medical and surgical treatment of indigent persons. Also, we take judicial notice of the extensive use of the many types of hospital insurance, as well as liability insurance by the institutions. Thus it is evident that times have changed and are now changing in the business, social, economic and legal worlds. The basis for, and the need of such encouragement is no longer existent." *Haynes v. Presbyterian Hospital Association,* 241 Iowa 1269, 45 NW2d 151, 154.

These are great, good, and necessary institutions, but in their modern management, business and charity are inextricably merged. One court has recently said that these institutions are nonprofit rather than charitable in character. *Silva v. Providence Hospital of Oakland,* supra, 14 Cal2d 762, 97 P2d 798.

It has been pointed out that the so-called public policy which protects charities from liability is "diametrically opposed" by the declared public policy of practically all of the states.

"" * * * As examples practically every state in the Union has enacted a workmen's compensation law; occupational disease disability laws making employers liable to workmen if the injury or illness arises out of and in the course of their employment regardless of any question of negligence; employment security acts designed to take care of individuals during periods of enforced idleness, and even in cases of voluntary strikes under certain circumstances thus relieving the unfortunates of the burdens of misfortune and shifting such burdens to the shoulders of the public at large. In addition to these laws Federal legislation has encompassed the entire field of welfare and social security.

"We believe that these legislative declarations of public policy which relieves the individual from the burden of his misfortunes and makes the general public bear the load levying taxes directly or indirectly to carry out such policy, completely repudiate the rule of nonliability of charitable institutions for the torts of their servants based on public policy." *Ray v. Tucson Medical Center,* supra, 72 Ariz 22, 230 P2d 220 at 229.

There are procedural difficulties involved in the immunity rule. The authorities are to the effect that, whether a corporation is being maintained for the purpose of charity or for profit is to be determined, not only from its powers, as defined by its charter, but also from the manner in which it is conducted.

In *Hamilton v. Corvallis Hospital Ass'n.,* 146 Or 168, 30 P2d 9, the defendant was organized as a charitable corporation, yet we held that whether the defendant was a charitable institution was for the jury to decide upon conflicting evidence. See also, *Sessions v. Thomas*

*D. Dee Hospital Association,* 94 Utah 460, 78 P2d 645; *Emrick v. Pennsylvania R.Y.M.C.A.,* 69 Ohio App 353, 43 NE2d 733; *Southern Methodist Hospital of Tucson v. Wilson,* 45 Ariz 507, 46 P2d 118. See also, 25 ALR2d 36, Note 7, citing cases.

We do not criticize this ruling, but we do point out that the application of the rule may result in jury verdicts finding both for and against the same institution on similar evidence, but involving different parties. Such inquiries into the source and employment of the corporate funds will result in long and complicated trials involving inquiry into all the charges and practices of corporations organized as charities, with the results constantly in doubt. Notwithstanding the immunity rule, the expense of such extensive inquiry into the nature and character of the institution will have to be borne by the charity before immunity can be established.

Another line of authority recognizes the immunity doctrine, but holds that the defense may be waived by the charity. *Marabia v. Mary Thompson Hospital,* 309 Ill 147, 140 NE 836. It is a strange situation when immunity is given to a charity on a theory that the trustee is without power to dissipate trust funds or to thwart the intent of charitable donors, but that it can waive immunity by failing to defend upon that ground.

Other, and serious complications, have arisen in the jurisdictions which have followed the trust fund doctrine. We have called attention to the fact that difficult questions may be submitted to juries under the Oregon decisions for the purpose of determining whether a given institution is or is not in fact a charity. But a more serious question is stated by the editors of ALR as follows:

"The question to be discussed at this point is whether a tortfeasor, notwithstanding its charitable

nature, is liable where the tort has been committed in the course of noncharitable activities. * * *'' 25 ALR2d 130, Anno: Charity—Tort Liability—Immunity, § 33.

The editors make the following statement concerning the prevailing rule in the jurisdictions which recognize the immunity doctrine:

"While a charitable corporation is not liable for negligence in the course of activities within its corporate powers carried on to accomplish directly its charitable purposes, even though such activities incidentally yield revenue, most courts which have considered the question as a distinct issue hold, even in the absence of a statutory provision, that there is liability for negligence in the course of activities incidental to the corporate powers but primarily commercial in character, though carried on to obtain revenue to be used for the charitable purposes of the corporation." 25 ALR2d 130, Anno: Charity—Tort Liability—Immunity, § 33.

The issue now under consideration is one relating to liability to suit. It is not a question as to what property may be levied upon, although owned by a charity. The weight of authority appears to be that a charity, although it be held to be such, is nevertheless liable to an action for damages if the tort committed by its agents occurred in the course of noncharitable activity, and the fact that the proceeds from the operation of an incidental noncharitable activity may be devoted to the uses of the charity itself appears to be immaterial. For a list of cases so holding, see 25 ALR2d, pages 130 to 132. This court has never had a question of this type presented to it, but since we are considering whether the immunity doctrine should prevail in this state, it seems proper to consider the complications which surely will arise if that doctrine is adhered to.

It seems reasonable to hold, as a number of courts have done, that a charitable institution actually operating as such, which also rents out land or buildings to third parties for revenue, or engages in competitive business for revenue, should be held liable for torts in connection with the operation of such noncharitable activities. This is the holding of the cases to which we have referred. But if we hold that charitable corporations are liable for torts committed in noncharitable activities, we immediately open the door to endless litigation in which the question presented will be whether the particular activity was sufficiently closely connected with the charitable purpose to warrant the extension of the doctrine of immunity to it. In this connection we are reminded of the analogous situation of tax exemption in the case of charitable corporations. The rule in such cases was laid down at an early date in the case of *Benevolent Society v. Kelly,* 28 Or 173, 42 P 3. In that case this court held that the law expressly "confines the right of exemption to such real estate only belonging to them [that is, to the charity] as shall be actually occupied in a particular manner, and for a specified purpose, and this right, therefore, clearly cannot be extended to property occupied and used for other and different purposes, although the revenue derived from its use is devoted exclusively to the objects for which the institution was established. * * *" 28 Or at 193. The rule was considered at length, and again approved in *Willamette University v. Knight,* 35 Or 33, 56 P 124. If a charity enters into a business which is competitive with other private businesses, such as operating a store, or renting homes to third parties, the law of Oregon recognizes that the property so used is taxable notwithstanding the fact that the funds derived from the business or the rental

are devoted to the purposes of the charity. Strangely enough, it has been held that the sole test as to whether property is subject to execution on a judgment for tort is to be determined by ascertaining whether the property is subject to taxation. In other words, if property is subject to taxation under the tax laws, there is a clear declaration of public policy to the effect that such property is not being used for a charitable purpose, and if it is not being used for a charitable purpose, then it would seem to be a property, the management and operation of which, is noncharitable within the rule to which we have referred, resulting in a conclusion that the charity might be held liable in damages for any tort committed in connection with a noncharitable activity, even under the trust fund doctrine. See *Baptist Memorial Hospital v. Couillens,* 176 Tenn 300, 140 SW2d 1088 (1940). If we adhere to the trust fund doctrine, and also adopt the all or none theory of immunity, it would appear that we will be adopting a public policy which is in direct contravention to the expressed public policy with reference to immunity from taxation. We will have the legislative policy which provides that when a charity engages in private business in competition with others, it is subject to taxation, but on the other hand, we will be adhering to the judicially announced theory that a charity which engages in a private business in competition with others is to be held immune from liability for torts committed in the course of that private enterprise. Whatever the decision may be in the future, if we adhere to the trust fund theory it is obvious that there will be a multitude of actions at law brought against charities and involving them in difficult and complicated litigation, the result of which will depend upon the decision of juries and the consequences of which will be large expense

to the charity against which expense it may not have protected itself by insurance.

The weight of authority is not to be determined solely upon a numerical basis. In *Henry W. Putnam Memorial Hospital v. Allen*, CCA2d (1929), 34 F2d 927, the Court of Appeals (Justices Learned Hand, Thomas W. Swan and Augustus N. Hand) considered an appeal by the defendant, a charity, from a judgment for plaintiff for $18,230. Plaintiff was severely injured in a collision with a negligently driven ambulance, operated by the hospital. We quote from the unanimous opinion of the court:

"* * * we have no difficulty in deciding that irresponsibility should not be extended to the tortious infliction of damage upon strangers. To hold that a charitable institution, whose agent negligently runs down a pedestrian upon the street, need not respond in damages, although the circumstances are such as would render any other defendant liable, seems to us a monstrous doctrine.

"It is true that several courts of high authority have gone to this extreme. [Citing cases.] But in our opinion no adequate reason has been, or can be, advanced for allowing the purpose of the settlor of trust funds to introduce into the law a principle which, to us, appears so anomalous and so unjust. We prefer the reasoning of cases which have applied the ordinary rules of liability to such a situation as is now before the court. [Citing cases.]"

Since the decisions on both sides of this question are based upon broad conceptions of public policy as determined by the courts, it is proper to consider the nature of public policy and the function of the courts with respect to it. A learned article by Professor Lester W. Freezer contains a splendid exposition of public policy, as it applies to these cases. He demonstrates the profound changes which have taken place

in the administration of charities. He comments on the private right of a negligently injured person to compensation, but he deals chiefly with the public interest in the case of such an injured person. That interest is, first, that he be rehabilitated, to the end that he shall not become a public charge, and, second, that he shall again be rendered capable of contributing to the economic life of the community. The author continues:

"* * * If the institution, through negligent injury to him, prevents the fulfillment of either of these objects, it has in that case and to that extent defeated the purpose for which it was created. Laying aside the loss and suffering of the individual, the institution whose negligent servant injures an inmate so that his economic value to society is reduced, has failed in its duty to society and to the members of society who have established and maintained it.

"This thought, that the charity which has negligently injured a beneficiary, defeats its purpose, has been suggested in some judicial opinions, but this type of reasoning is usually based upon considerations referring to the individual welfare of the beneficiary involved. The judiciary has, so far as may be inferred from the cases discovered in this study, generally failed to recognize the obligation which charity, according to the theory of modern sociology, owes to society, and which it shifts to other shoulders if it be immune from liability for negligent injury to its beneficiaries. * * *"

The rest of Professor Freezer's article is too long for quotation, but worthy of study. See Pennsylvania Law Review, Vol 77, p 191 (1928-29).

The opinion of legal scholars outside the court is disclosed by the editors of ALR as follows:

"On the other hand, as recognized by the courts, opinion among scholars outside the courts almost

uniformly supports the doctrine of liability as against that of immunity. It has been pointed out that a court, in ruling on the question of immunity as one of first impression, or in determining whether earlier cases granting immunity should be overruled, should be guided by the unanimous opinion of legal writers on the subject."

See citation of numerous legal treatises, note, 25 ALR2d 42.

From *Ray v. Tucson Medical Center,* supra, we quote the following:

"Realizing that public policy is, in its very nature, always fluctuating, varying with customs growing out of changing social, political and economic conditions and recognizing the radical changes that have taken place in each of these fields of activity during the past two decades, we believe it not only proper but necessary that we reconsider the rule laid down in those cases.

\* \* \* \* \*

"The declaration of 'public policy' is primarily a legislative function. The courts unquestionably have authority to declare a public policy which already exists and to base its decisions upon that ground. But in the absence of a legislative declaration of what that public policy is, before courts are justified in declaring its existence such public policy should be so thoroughly established as a state of public mind, so united and so definite and fixed that its existence is not subject to any substantial doubt. Sheehan v. North Country Community Hospital, 273 N.Y. 163, 7 N.E.2d 28, 29, 109 A.L.R. 1197. It is equally true that when the reason for the existence of a declared public policy no longer obtains that the courts should without hesitation declare that such public policy no longer exists." *Ray v. Tucson Medical Center,* 230 P2d at 222 and 229.

The most recent decision to which our attention has been called is *Noel v. Menninger Foundation,* 175 Kan

751, 267 P2d 934. The case was decided by the Supreme Court of Kansas in March 1954. In that case, the lower court followed earlier decisions of the Kansas Supreme Court and denied recovery to an injured patient. As in the case at bar, the plaintiff asked the Supreme Court of Kansas to reconsider its former holdings in the light of social conditions and tendencies now prevailing. The court reviewed the modern tendencies which demonstrate a public policy favoring recovery. It then overruled its previous decisions and held against the immunity doctrine generally. The court held that the legislature and not the courts create and grant immunity from liability for wrong-doing, and it even went so far as to say that "To exempt charitable and nonprofit corporations from liability for their torts is plainly contrary to our constitutional guaranties, Bill of Rights, § 18." The court quoted further, and with approval, the following:

" 'The declaration of public policy is primarily a legislative function though courts have authority to declare a public policy which already exists and to base its decisions upon that ground, but in absence of a legislative declaration before courts are justified in declaring existence of public policy it should be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt. (Headnote 7.)' " *Noel v. Menninger Foundation,* 175 Kan 751, 267 P2d 934 at 941.

In Iowa the Supreme Court reconsidered its previous decisions based upon matters of public policy and said:

"Public policy simply means that policy recognized by the state in determining what acts are unlawful or undesirable, as being injurious to the public or contrary to the public good. It is not quiescent but active. A policy adopted today as

being in the public good, unlike the Ten Commandments, is not necessarily an ever enduring thing. As times and prospectives change, so changes the policy. * * *" *Haynes v. Presbyterian Hospital Ass'n.*, 241 Iowa 1269, 45 NW2d 151, 153.

"* * * The fact that the courts may have at an early date, in response to what appeared good as a matter of policy, created an immunity, does not appear to us a sound reason for continuing the same, when under all legal theories, it is basically unsound and especially so, when the reasons upon which it was built, no longer exist." 45 NW2d at 154.

The court then said:

"It is our considered judgment that incorporated charity should respond as do private individuals, business corporations, and others, when it does good in the wrong way. * * *" *Haynes v. Presbyterian Hospital Ass'n.*, 241 Iowa 1269, 45 NW2d 151 at 154.

Previous decisions overruled.

In *Foster v. Roman Catholic Diocese of Vermont*, supra, 116 Vt 124, 70 A2d 230, 235, the court said:

"* * * There is no sufficient reason under a sound public policy requiring this court to say that an individual be deprived of his right to recovery from such an institution because its funds are derived from a charitably minded public. The enforcement of the individual's rights to recover will not deprive the public of the benefits of the institution. That has been shown to be true in those jurisdictions where liability is the law. A charity should not be permitted to inflict injury upon one without redress in order that it may do charity to others. The result would compel the injured person to contribute to the charity against his will. * * *" 70 A2d 230 at 235.

The Supreme Court of Mississippi, in overruling previous cases and repudiating the earlier doctrine

of immunity, had the following to say concerning the public policy issue:

"In response to what appeared good as a matter of public policy at an early date, many of the courts have created an immunity, which, under all legal theories, is basically unsound, and especially so, when the reasons upon which it was founded no longer exists. Moreover, the function of creating a public policy is primarily one to be exercised by the Legislature and not by the courts. It is equally true that when the reason for the existence of a declared public policy no longer obtains, the court should, without hesitation, declare that such policy no longer exists, and especially where the same has been created by the courts instead of by the Legislature." *Mississippi Baptist Hospital v. Holmes,* supra, 214 Miss 906, 55 So2d 142 at 152.

By way of summary we quote further from *President and Directors of Georgetown College v. Hughes,* supra, 130 F2d 810 at 827:

"* * * The rule of immunity is out of step with the general trend of legislative and judicial policy in distributing losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than in leaving them wholly to be borne by those who sustain them. The rule of immunity itself has given way gradually but steadily through widening, though not too well or consistently reasoned, modifications. It is disintegrating. Each modification has the justification that it is a step in result, if not in reason, from the original error toward eventual correction. As more and more steps are taken, correction becomes more complete. The process is nearing the end. This leaves the steps untaken standing out as the more anomalous."

We will next consider the Oregon decisions.

The first case was *Hill v. Tualatin Academy,* 61 Or 190, 121 P 909. A four-year-old invitee, or licensee, was

injured by the explosion of a gopher gun on the grounds of the academy. In holding for the defendant, the court cited *Feoffees of Heriot's Hospital v. Ross,* 12 Cl. & F. 507, since overruled, and other cases. The court held that a charity is immune from liability for tort "unless prior to such occurrence, the charitable institution had knowledge of his [the employee's] unfitness or incapacity." By this language the court took note of one of the well-recognized exceptions to the trust fund doctrine. The court distinguished the cases which imposed liability upon the ground that, in those cases the tort had occurred in the regular course of business of the charity. It was said that the Tualatin Academy was not incorporated to undertake the killing of gophers. The court relied upon the specific terms of the special legislative act which incorporated the institution. That act provided "that the capital stock of said institution shall never exceed five hundred thousand dollars, *nor the income or proceeds of the same be appropriated to any other use than for the benefit of said institution as contemplated by this act."* Legislative Assembly, Territory of Oregon, Fifth Regular Session, January 13, 1854, page 30. (Italics ours.) The provisions of the special legislative act incorporating the charity were apparently considered to be a legislative declaration of a public policy favoring immunity as to the particular institution in question. The trust fund doctrine, with the exception previously noted, was apparently approved, but, under the circumstances, the case cannot be considered as standing for unqualified immunity. The immunity was thought to be legislative. We shall later discuss the effect of the provision in the legislative charter.

The second case is *O'Neill v. Odd Fellows Home,* 89 Or 382, 174 P 148. The plaintiff, an employee, was

520

injured by the negligence of the agents of the defendant and was denied recovery. The court first considered whether the case came within the purview of the Employers' Liability Act, which would seem to be immaterial if there is a general doctrine of immunity from tort liability. It was held that the case did not come within the employers' liability law. The court, in denying recovery to the plaintiff, relied upon a statute similar to the one which was applied in *Hill v. Tualatin Academy*. The statute in question provided that "*no part of the resources of said corporation shall ever be used for any other than the object herein named.* \* \* \*" 89 Or at 392. The difficulty with this portion of the decision is that the Odd Fellows Home was not incorporated under the statute cited and relied upon by the court. The error in this regard has been clearly pointed out in our later case of *Gregory v. Salem General Hospital*, supra, 175 Or 464, 476, 153 P2d 837. In view of this error, the O'Neill case cannot be considered an authority for the immunity doctrine. Furthermore, in discussing the trust fund theory, the court said:

"\* \* \* However, liability is recognized as to strangers and servants to be compensated from such trust funds. \* \* \*" *O'Neill v. Odd Fellows Home*, supra, 89 Or 382 at 392.

By the language quoted, this court recognized two of the well-established exceptions to the immunity doctrine.

The third case is *Hamilton v. Corvallis Hospital Ass'n.*, 146 Or 168, 30 P2d 9 (1934). The action was by a patient in the hospital. The case illustrates the complications which arise out of the nonliability doctrine. The corporate charter indicated that the defendant was a charity, but the entire history of the

defendant corporation was put in evidence and the rule was announced that, whether a defendant is a charitable corporation is to be determined, not only from the charter, but from the manner in which the institution is conducted. Thus the door was left open for the determination by juries as to the charitable character of a corporation after a review of its conduct in each individual case. Commenting upon the Hamilton case, this court said that there was a bona fide issue as to the true character of the defendant, and we added, "Hence, this court was bound to yield effect to the jury's verdict. * * *" *Gregory v. Salem General Hospital*, 175 Or 464 at 478.

In the Hamilton case the court enumerated the various theories which have been adopted in support of charitable immunity for tort, i.e., trust fund, implied waiver, and public policy. But, it declined to commit itself, and relied upon precedent. It quoted, with approval, as follows:

"* * * 'It does not seem necessary to discuss again the reason for the rule or the conflicting theories.. * * *' " *Hamilton v. Corvallis Hospital Ass'n.*, 146 Or 168 at 178.

Speaking in 1934, the court said that the "overwhelming weight of authority is to the effect that a hospital association organized and conducting its business as a charitable institution is not liable for injuries suffered by its patients due to the negligence of its employees. * * *" *Hamilton v. Corvallis Hospital Ass'n.*, 146 Or at 177. It will be observed that the statement is limited to the question of liability to patients. As of today, even that limited statement must be revised. It is interesting to note that the jury passed upon the issue of the charitable character of the corpo-

ration, found it to be noncharitable, and judgment for the plaintiff was affirmed.

The fourth Oregon case is *Napier v. First Congregational Church,* 157 Or 110, 70 P2d 43. The action against the corporation was dismissed on motion of the plaintiff, who proceeded only against the trustees individually. The case is not in point.

Our most recent decision on the subject is *Gregory v. Salem General Hospital,* supra. The plaintiff, a paying patient, was injured by the negligence of a servant of the defendant hospital. Whether the defendant was a charity was put in issue, and again, that question was determined upon an examination of the history and conduct of the corporation. Among other matters, the size of salaries paid was considered. We stated that the immunity of a charity for liability from negligence conforms to the public policy of the state, and we commented upon the fact that the legislature had not changed the rule set forth in the earlier cases. We took note of the severe attacks upon the doctrine, but ultimately held that the rule of stare decisis requires us to hold that charities are exempt from liability for their acts of negligence. Notwithstanding the express recognition of exceptions to the immunity rule as stated in *Hill v. Tualatin Academy,* and *O'Neill v. Odd Fellows Home,* both supra, we said:

"* * * It will be observed from the foregoing decisions that exemption exists whether the tort was committed upon a stranger to the charity or upon one who was receiving its services. * * *"

The case was brought by a patient in the hospital and so the question of liability to a stranger or employee was not before us. Nevertheless, the case appears to recognize a broad general rule of immunity from lia-

bility for tort, whether the plaintiff be a patient, a stranger, or employee, and we expressly rejected the rule in many states that a charity may be liable for negligence in the selection of an incompetent employee. We said:

"* * * Since we have embraced the trust fund theory, it can make no difference whether due prudence was exercised in the selection of the tortious servant or whether he was inadvisedly chosen. The trust fund can not be depleted in either event." *Gregory v. Salem General Hospital,* 175 Or at 480.

After reviewing all of the Oregon decisions the editors of ALR make the following comment:

"This analysis of the Oregon cases seems to justify the conclusion that the Gregory Case, supra, is the first case which establishes the complete immunity of charities in Oregon, and that the earlier cases would not have bound the court under the rule of stare decisis so to hold." 25 ALR2d 186, Anno: Charity—Tort Liability—Immunity, § 39.

In support of the dictum applying the rule of general immunity, it must be conceded that if the trust fund doctrine is sound, then the only logical rule would be that of total immunity without exceptions. But if we adhere to the theory of immunity in all cases or in none, then we find the great and growing weight of authority is against us.

Whether the trust fund doctrine is sound, or whether, if unsound, it should be retained under the rule of stare decisis, is the first issue in the pending case. In considering those issues we must recognize that in the Gregory case we have announced the rule of total immunity.

Before stating our conclusion, we will consider the second contention of the plaintiff which presents a question new to this jurisdiction. The plaintiff argues

that where the tort immunity of a charitable institution is based on the trust fund doctrine, it is proper to plead and prove that the charitable institution has liability insurance indemnifying it against loss. But the rule is that the immunity of a charity from tort liability (as distinguished from exemption of its trust property from execution) is not lost or otherwise affected by the fact that the charity carries liability insurance. The reason for the rule is obvious. There are many risks and expenses against which a charity must protect itself, even under the immunity doctrine. In the following jurisdictions which follow the immunity doctrine, at least to a limited extent, the decisions support the rule as above stated. *Levy v. Superior Court,* 74 Cal App 171, 239 P 1100 (1925); *Cristini v. Griffin Hospital,* 134 Conn 282, 57 A2d 262; *Moore v. Moyle,* 405 Ill 555, 92 NE2d 81; *Williams' v. Church Home for Females and Infirmary for Sick,* 223 Ky 355, 3 SW2d 753; *Enman v. Trustees of Boston University,* 270 Mass 299, 170 NE 43; *Mississippi Baptist Hospital v. Moore,* 156 Miss 676, 126 So 465, 468 (this case was overruled by *Mississippi Baptist Hospital v. Holmes,* supra, in which the court repudiated the entire immunity doctrine and held that charities are liable for their torts, as in the case of private corporations); *Greatrex v. Evangelical Deaconess Hospital,* 261 Mich 327, 246 NW 137; *Stedem v. Jewish Memorial Hospital Ass'n,* 239 Mo App 38, 187 SW2d 469 (1945); *Fields v. The Mountainside Hospital,* 22 NJMisc 72, 35 A2d 701 (1944); *Herndon v. Massey,* 217 NC 610, 8 SE2d 914 (1940); *Emrick v. Pennsylvania RYMCA,* 69 Ohio App 353, 43 NE2d 733; *Süidekum v. Animal Rescue League,* 353 Pa 408, 45 A2d 59 (1946); *McLeod v. St. Thomas Hospital,* 170 Tenn 423, 95 SW2d 917; *Vanderbilt University v. Henderson,* 23 Tenn App 135, 127 SW2d 284; *Susmann v. YMCA,*

101 Wash 487, 172 P 554 (1918); *Schau v. Morgan*, 241 Wis 334, 6 NW2d 212.

Against this impressive weight of authority the plaintiff cites cases from Colorado, Tennessee and Illinois. The Oregon cases cited by the plaintiff do not sustain his position. One authority cited by the plaintiff upon this issue presents a vigorous argument supported by authority against the entire doctrine of immunity from liability. See 10 Am Jur 690, Charities, § 143. Other cases cited by the plaintiff do not support his position.

The fact of insurance constitutes merely one type of asset out of many which have been recognized by the courts as nontrust assets. The argument that the existence of insurance against liability establishes liability in cases in which there would otherwise be none, is strange to our ears. Insurance has no bearing upon liability. If relevant at all, it should be considered only in jurisdictions which recognize liability but allow execution only against nontrust assets. The idea that the existence of insurance may be pleaded or proven in a damage case on the issue of liability is abhorent to the firmly established doctrines of this state. See many cases cited, Oregon Digest, Trial, § 127. We must reject the plaintiff's second contention based on insurance.

The decision of this case depends solely upon our decision either to uphold or to reject as to the future the rule of charitable immunity. The recent decisions convincingly demonstrate that the immunity doctrine is unsound and unworkable. The question is; what shall we do about it? In the Gregory case the successful plaintiff was a patient in the hospital, but our opinion in that case is broad enough to extend immunity to cases brought by strangers. The Gregory case was the unanimous decision of this court, and it is, of course,

entitled to serious consideration. However, the rule of stare decisis does not have the binding effect here as it would have if the Gregory case had been one establishing a rule of property or one concerning the validity of contracts in reliance upon which vested rights had been acquired. It must first be borne in mind that the rule of stare decisis has no application unless the facts on which the earlier case was decided are substantially the same as those now before the court. We need not contend that the earlier cases in this state were bad law. We do contend that the changes which have occurred in the size and activities of charities as indicated in the many authorities cited now present a different problem based on new facts. Examination of the great number of cases cited in 25 American Law Reports Second convincingly shows that even under the immunity doctrine charities must and do resort to protection through indemnity insurance. This fact is not cited to support plaintiff's contention that the existence of insurance establishes liability to suit. The argument for liability is based upon considerations having nothing to do with insurance. But the obvious fact remains that in those jurisdictions which now hold or may hereafter hold charities liable for tort, there exists and is now in use a procedure whereby its assets, whether technically trust or nontrust, may be protected from depletion through indemnity insurance. This appears to be true in the case at bar.

The change in the nature and activities of charities and the judicial conception of public policy has been gradual, but if the change has occurred, the fact that it has been gradual does not argue that it must be permanently ignored. The significant change in the attitude of the courts which has occurred since our last decision in 1944 demonstrates that the time has now

come for a new appraisal of the facts and the social mores of our time.

The doctrine of stare decisis has not been thought to prevent change in judicial decision when decisions are based on considerations of changing public policy.

> "No rights of property involved, nor rule of practice, the American doctrine of stare decisis is guiding policy, not inflexible rule. 14 Am. Jur., Courts, § 124, et seq. It is no shield for plain error. Neither does it bar coordination of legal philosophy with that of new and commanding facts. Such coordination is necessary in order to satisfy the imperative demand for realistic judicial treatment of issues in their own actual environment rather than a synthetic one made from the materials of discarded doctrine. Particularly, it can have no restraining effect when, as here, an earlier policy of decision law is opposed to a later rule declared by statute." *Park Construction Co. v. Independent School Dist.*, 209 Minn 182, 296 NW 475.

The inapplicability of stare decisis to decisions based on public policy is pointed out in *Carroll v. Local No. 269 International Brotherhood of Electrical Workers:*

> "It is the peculiar strength of the common law that no decision is 'stare decisis' when it has lost its usefulness in social evolution, but it is distinguished, and if times have sufficiently changed, overruled. Carroll v. Local No. 269 International Brotherhood of Electrical Workers, 31 A.2d 223, 225, 133 N.J.Eq. 144." Words and Phrases, Perm ed, 39A, Stare Decisis, p 615.

Our own court has clearly recognized the distinction here made:

> "The following statement of the doctrine of stare decisis made by Daniel H. Chamberlain (Chamberlain, Stare Decisis, 19; Prize Essay, 8 N.Y. Bar

Rep. 69) has been highly commended (37 Harvard Law Rev. 409):

" 'A deliberate or solemn decision of a court or judge, made after argument of a question of law fairly arising in a case, and necessary to its determination, is an authority, or binding precedent, in the same court or in other courts of equal or lower rank, in subsequent cases, where "the very point" is again in controversy; but the degree of authority belonging to such a precedent depends, of necessity, on its agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law, and the compulsion or exigency of the doctrine is, in the last analysis, moral and intellectual, rather than arbitrary or inflexible.' " *State v. Mellenberger,* 163 Or 233, 259, 95 P2d 709, 128 ALR 1506.

Again, it is held that stare decisis does not apply to language used in an opinion which is unnecessary to the conclusion reached. *Todd v. Yelle,* 7 Wash2d 443, 110 P2d 102; *Swetland v. Curtis Airports Corp.,* 41 F2d 929, 936.

In *Gregory v. Salem Hospital,* supra, we did not defend the immunity rule. We recognized that it was the object of severe criticism, but adopted the view that the rule of stare decisis required us to adhere to it. We relied upon the fact that the legislature which was presumed to know of our decisions had not changed the rule. We stated that "The decisions which criticize the exemption rule emanate chiefly from jurisdictions which had not embraced the rule. We observe that those decisions are frequently pronounced by divided courts * * *." 175 Or 464 at 481. Those statements were true in 1944, but a review of the decisions since that date discloses that they must now be modified. Unanimous decisions in at least four cases have been made overruling previous decisions, as is now requested of us.

As to the nonaction of the legislature, it has been judicially pointed out that the injustices which have been suffered by persons injured through negligence of a charity have been so infrequent that the matter is not ordinarily brought to the serious attention of the legislature. So far as we are aware, this is the situation in Oregon. It has also been repeatedly said in the cases cited supra that since the doctrine of immunity was adopted by judicial decision, the courts should now, in the light of changed conditions, declare that public policy no longer supports the doctrine, as once it did.

The court is, and must be, slow to overrule its earlier decisions, unless justice can be done in no other way, but we think the time has now come to align ourselves with the prevailing modern authority. In doing so we do not necessarily overrule the early cases because they were bad law when decided, but because in this modern world they would be bad law if perpetuated.

In *Pierce v. Yakima Valley Memorial Hospital Assn.*, 43 Wash2d 162, 260 P2d 765, decided in 1953, the Supreme Court of the State of Washington was confronted with a similar but more serious problem than that which is before us. A paying patient was seriously injured through the negligence of an employee of the charity. The sole question was whether the court should adhere to the rule of charitable immunity. The court had upheld the rule of nonliability in a long line of cases extending over a period of 40 years.

In *Magnuson v. Swedish Hospital*, 99 Wash 399, 169 P 828, the court reexamined the problem but declined to change the immunity rule by reason of the doctrine of stare decisis, because the legislature had not repudiated the rule and because of the "*overwhelming weight of authority.*" (Italics ours.)

In *Miller v. Mohr*, 198 Wash 619, 89 P2d 807 (1939),

the court was again asked to reconsider. It again declined, and referred to the *"greater weight"* of authority. (Italics ours.) In 1940 the Miller case again came before the Supreme Court. The earlier decision was deemed to be the "law of the case", but two judges expressed the opinion that the immunity rule had "become an anachronism and should be no longer enforced." They predicted that "The next generation of judges will surely abandon the rule if we do not." *Miller v. Sisters of St. Francis,* 5 Wash2d 204, 105 P2d 32.

Again in 1943 the court was asked to abandon the rule. It declined, two judges dissenting. This history was reviewed in *Pierce v. Yakima Valley Memorial Hospital Assn.,* supra, and the court then proceeded with a brilliant analysis of the entire problem. We quote portions of the opinion:

> "Perhaps the best way of determining whether the charitable institutions of today need the 'encouragement and stimulation' which immunity affords, is to examine what has happened to them in jurisdictions where the immunity rule does not prevail. We have found nothing in the decisional law of this country to indicate, by statistics or otherwise, that undue hardships or calamities have befallen them. This same observation has frequently been made by other courts and text-writers. * * *" *Pierce v. Yakima Valley Memorial Hospital Ass'n.,* 43 Wash2d 162, 260 P2d 765, 770.

The insurance aspect was dealt with as follows:

> "In the instant case it was alleged in the complaint that respondent hospital is fully protected by liability insurance from which any judgment for appellant would be paid. However, the fact that an individual defendant institution has, or does not have, such protection, is wholly immaterial in de-

termining liability. The taking of liability insurance could create no liability where none before existed. Susmann v. Young Men's Christian Ass'n, 101 Wash. 487, 495, 172 P. 554. Our view in this regard accords with the great weight of authority. See 25 A.L.R.2d 29, 139.

"The fact that the protection afforded by liability insurance is now available to charitable institutions generally is nevertheless appropriate for consideration, where the question is whether, as a matter of public policy, such institutions need immunity. Mississippi Baptist Hospital v. Holmes, supra; President and Directors of Georgetown College v. Hughes, supra. As Judge Rutledge pointed out in the latter case:

" ' * * * What is at stake, so far as the charity is concerned, is the cost of reasonable protection, the amount of the insurance premium as an added burden on its finances, not the awarding over in damages of its entire assets.' 130 F.2d at page 824." 260 P2d 765 at 770.

After reviewing the changes in judicial opinion, the court gave consideration to the rule of stare decisis. It observed that many courts have expressed the view that it is for the legislature and not for the courts to establish a policy of exemption. It then said:

"However, having previously undertaken this function, and having now concluded that our court-declared policy is no longer valid, there seems to be no compelling reason why we must wait for legislative action. We closed our courtroom doors without legislative help, and we can likewise open them. It is not necessary that courts be slow to exercise a judicial function simply because they have been fast to exercise a legislative one. As one writer has said:

" 'The courts which have granted immunity to charitable organizations appear to have usurped the legislative function of declaring public policy and

making changes in the law in accord therewith. It would be strange for these same courts to sit back and wait for the legislatures to reverse the value judgments the courts have made.' 38 Columbia Law Review 1485, 1489.''

The court then quoted with approval, ' ''There is involved here no rule of property or contract, but only a rule of nonliability benefiting a particular class of persons in actions *ex delicto.*  *  *  *  Where the proposal is to open the doors of the court rather than to close them, the courts are quite competent to act for themselves.'' ' The majority conclusion was that previous decisions should be overruled. Judgment for defendant was reversed. Chief Justice Grady concurring specially said:

''*  *  *  I have believed that if for any reason the rule should be changed, such change should be made by the legislature especially if the rule be one relating to public policy. I expressed this view in my dissent in the recent case of Hutton v. Martin, 41 Wash.2d 780, 252 P.2d 581. However, experience has demonstrated that when immunity from liability is involved, legislatures are faced with strong opposition to change by those who are the beneficiaries to such rule, and proponents of a change find efforts to secure corrective legislation futile. When such a situation arises and the courts have become convinced that the rule should no longer exist, there is justification for action to be taken by them.'' 260 P2d 765 at 775.

As appears from the analysis of our previous opinions, the problem is involved in far less difficulty than was the case in the Washington decision in which a long line of earlier cases had to be overruled. We hold that the rule of stare decisis does not obligate the court to adhere to a rule of total or partial immunity.

In this opinion we have approved the contention

that since the judiciary closed the doors of the court to injured litigants it is now within the province of the judiciary to open them again. It may be argued, however, that the immunity doctrine is grounded upon some legislative declaration of public policy and that therefore the court should not change the rule. An examination of the record will demonstrate that the legislature has not attempted to adopt any public policy in contravention of that which flows from Oregon Constitution, Article I, § 10. The defendant in its answer alleges that it is a "nonprofit corporation organized under the nonprofit laws of the State of Oregon." There is no reference to any other law under which it was organized. The legislation commences with the act of October 24, 1864, which provided for the incorporation of churches, religious, benevolent, literary and charitable societies. The articles were required to specify, among other things, the location of said church or society. Among the powers granted was "the power to sue and be sued."

The statute of 1864 was amended many times, but from that date, to and including the 1925 amendment, the law continued to include churches and religious societies and required the articles of incorporation to specify the location of said church or society. OC, 1930, §§ 25-901 to 25-932. This statute appears under the heading "Nonprofit Corporations in General". It contains provisions for incorporation of bishops, vestrymen, denominational schools and many other organizations. The statutes remained unchanged in this respect until the 1937 act which appears as OCLA, § 77-401 to 77-409 inclusive. That enactment which roughly corresponds to the first section of the earlier act eliminates the words "churches and religious societies", and in place of the enumeration of the various

types of organizations which were authorized to incorporate under the earlier statutes, it inserted the following:

> "Whenever any committee, group or organization which shall desire to incorporate for the purpose of carrying out the objects of such committee, group or organization without profit to said corporation or to the members thereof, the incorporation of any such committee, group or organization may be effected in the manner provided in this chapter.  *  *  *"  OCLA, § 77-401.

That act, perhaps inadvertently, neglected to eliminate the requirement that the articles of incorporation must specify the location of the church or society. The statute appears under the heading "Nonprofit Corporations—Generally".

The next amendment to the nonprofit laws was made in 1941. That act provides:

> "Corporations may be created under this act for any lawful purpose so long as they do not engage in any form of trade or commerce, or carry on any activity which will result in a remunerative profit to themselves or to any of their members." Oregon Laws 1941, Chapter 462, Section 1; ORS 61.010 et seq.

It eliminates the provision which requires the articles of incorporation to specify the "location of the church or society" and it requires in lieu thereof, that the articles specify "The address of the principal office of the corporation", with no reference to churches. ORS 61.010 and 61.040. The 1941 statute also requires that every corporation governed by the act shall file with the corporation commissioner a power of attorney designating someone on whom summonses, writs or process may be served. ORS 61.090. A corporation

failing to appoint such attorney shall be dissolved. Oregon Laws 1941, ch 462, Sec. 11. (now ORS 61.110).

"Any corporation that may be dissolved under any provision of this act shall continue to exist as a body corporate for a period of five years from the date of such dissolution for the purposes of liquidation and the enforcement against it and its assets of all rights of suit or action, but for no other purpose. * * *" ORS 61.090 to 61.110

The changes made in the nonprofit corporation laws themselves manifest a tendency away from immunity and toward liability for torts as to corporations organized under its terms.

The provisions of ORS 61.010 and 61.160 inclusive, contain no word which intimates that there is any immunity from liability for tort, or which recognizes any trust fund doctrine. Every reference to church organizations has been deliberately eliminated, the obvious reason being that the law providing for their creation is found in a different statute. Provision for the organization of denominational universities and colleges is made by ORS 61.310 et seq., and the statute providing for the organization of church corporations is found in ORS 61.410.

We will next trace the history of the law concerning the formation of church corporations. That act was passed in 1872. It provides "That incorporations may be formed for acquiring, holding and disposing of church property; for the benefit of religion; for works of charity, and for public worship, in the manner hereinafter provided in this Act." Laws, 1872, page 135. By employing more suitable punctuation, the Oregon Revised Statutes clarified but did not change the meaning of the 1872 act. The section now reads as follows: "Corporations may be formed for acquiring, holding

and disposing of church property for the benefit of religion, for works of charity and for public worship, in the manner provided in ORS 61.410 to 61.460." ORS 61.410.

Obviously the only institutions which may be incorporated under the act are those acquiring, holding and disposing of *church property* for the three purposes specified. The act extends no further. The next section fortifies this conclusion. The only persons authorized to file articles of incorporation are "One or more of the principal officers, trustees or clergy of any *church* * * *." ORS 61.420. (Italics ours.)

The 1872 law, section 5 (now ORS 61.450) provides that such corporation shall have power to sue and be sued. Again, section 3 (now ORS 61.430) requires the articles of incorporation to specify the estimated value of the "*church property*". Section 4 (now ORS 61.440) contains the following proviso: "That no part of the resources of said corporation shall ever be used for any other than the object herein named; * * *." It is important to note that the language of the proviso is similar to that found in the legislative charter of Tualatin Academy, which reads, "that the capital stock of said institution shall never exceed five hundred thousand dollars, nor the income or proceeds of the same be appropriated to any other use than for the benefit of said institution as contemplated by this act."

In *Hill v. Tualatin Academy*, supra, this court said, "The act referred to manifests a legislative intention to incorporate a charitable institution." This is obvious, but it does not follow that the legislature thereby declared the charitable institution to be immune from liability for tort. The only meaning properly attributal

to the proviso is that in its activities those corporations are limited to the pursuit of the objects for the accomplishment of which it is incorporated.

In the light of these statutes we return to *O'Neill v. Odd Fellows Home,* which was a charitable institution. That case erroneously said that the defendant was organized under the 1872 Act, now ORS 61.410, when in truth it could only have been organized under the 1864 laws, now ORS 61.010 et seq. Acting upon this misapprehension, the court concluded that the corporation was immune to liability.

We now turn to *Gregory v. Salem General Hospital,* supra. Referring to the proviso in the 1872 law (now ORS 61.440) the court said: "We think it is evident that Laws of 1872, page 135, is applicable only to the formation of ecclesiastical corporations. The defendant is not a corporate body of that kind." We held that the defendant, Salem General Hospital, was a charitable corporation, but not an ecclesiastical corporation, and that consequently it was formed under the Laws of 1864 which contained no proviso such as is found in the 1872 law. We then directed our attention to the provisions of the Laws of 1872, which now form a part of the law concerning the organization of church corporations, and we said:

"The words of § 77-414 (Laws of 1872, page 136, § 4) upon which the plaintiff depends, were not, in our belief, intended to grant an ecclesiastical corporation immunity from tort liability, but to restrict it to the field of religion, charity and public worship; in other words, to prevent it from engaging in business. Exemption from tort liability, we think, is not dependent upon the presence of words of the above kind in a statute under which the corporation was formed, but the fact that it was engaged in works of charity, benevolence, religion or educa-

tion." *Gregory v. Salem General Hospital,* 175 Or 464, 472, 153 P2d 837.

We adhere to the statement last-quoted from the Gregory case, and for reasons which will be set forth.

In support of what was said in the Gregory case, we think the meaning of the legislature can be made clear by reading the provisions of ORS 61.410 together with the last clause of ORS 61.440. The result would be as follows:

> "Corporations may be formed for acquiring, holding and disposing of church property for the benefit of religion, for works of charity and for public worship, in the manner provided in ORS 61.410 to 61.460 * * * provided, however, that no part of the resources of the corporation shall ever be used for any other than the object named in ORS 61.410."

The proviso clearly limits the church corporations to the charitable or church activities specified. It neither adopts nor rejects the immunity doctrine. The fact that a church corporation is forbidden to enter into private business for profit does not require a conclusion that it is immune to liability when it commits a tort in carrying out the charitable or religious functions which it is authorized to perform.

The defendant's claim is that it was pursuing and *using* its *resources* for the very object for which it was incorporated—charity. The argument for recovery is that in the use of its resources for that purpose, an incidental liability was incurred, because it "did good in the wrong way." In our opinion, an enforced compensation of a negligently injured party constitutes an incidental expense which grows directly out of its authorized charitable activity, and which, aside from the fact that it is imposed by law, would itself be a charit-

able object. Nor can it properly be said that the enforcement by a plaintiff of a judgment is the *"use"* of the corporate resources for any other than the object named in the statute. We think that "use" means use by the corporation.

We doubt if anyone has ever argued that a charitable or church corporation is not liable in damages for breach of contract, or has ever intimated that if such a corporation within the scope of its charitable powers, makes and breaks a contract, it is "using" its resources for any object other than that named in the statute, when execution issues upon a judgment against it.

If there were any doubt as to the construction of the statute, we would rely upon the rule that "Where a statute is equally susceptible of two interpretations, one in favor of natural right and the other against it, the former is to prevail." ORS 174.030. It follows that the public policy of nonliability of charitable corporations for tort which we have previously espoused in the name of the trust fund doctrine is not based upon a public policy declared by the legislature, but is rather, the product of judicial decision, and as indicated in the earlier portion of this opinion, we conclude that the policy which was adopted by judicial decision may, and should, at this time be changed to fit modern conditions.

In closing, we take note of the fact that the rule of charitable immunity was first introduced into America in 1876. In that year the Massachusetts court adopted what it understood to be the English rule, although at that time the English decisions had been overruled. There was no immunity rule in Oregon until 1912. Our constitution was adopted and in effect on 14 February 1859. It provides that every man shall have a remedy

by due course of law for injury done him in his person, property or reputation. We need not hold that immunity cannot be granted to charitable institutions. We do hold that at the time of its adoption the constitution clearly indicated that liability for tort and not immunity therefrom is the general rule, and we do hold that under now-existing conditions the rule of charitable immunity is not in accord with the public policy of this state.

After pursuing the law through this maze of conflicting decisions and complicating circumstances, it comes almost as a shock to realize the extreme simplicity of the possible solution. The courts have labored under the false impression that they must choose between alternatives; on the one hand the laudable desire to prevent the depletion of funds devoted to charity, and on the other, the equally laudable desire to afford a remedy by due course of law to one who has been tortiously injured. Experience in other states and in the modern business world demonstrates that it is possible and desirable to satisfy both objectives. Charities now find it advisable to take out insurance against various contingencies in order to protect their assets from depletion. By continuing the same or a broader coverage, they can protect their trust fund and their nontrust funds from depletion and at the same time can satisfy the demands of justice as well as of mercy by providing for the compensation of those whose usefulness to society has been impaired by their tortious actions.

For the foregoing reasons we dissent from the opinion of the majority.