Argued January 31; affirmed February 27, 1934

# HAMILTON *v.* CORVALLIS GENERAL HOSPITAL ASSOCIATION

(30 P. (2d) 9)

*Frank S. Senn,* of Portland (Lester G. Oehler, of Corvallis, and Senn & Recken, of Portland, on the brief), for appellant.

*Mark V. Weatherford,* of Albany (Weatherford & Wyatt, of Albany, on the brief), for respondent.

BAILEY, J. The two assignments of error urged on this appeal are based on the refusal of the court to grant defendant's motions for a nonsuit and for a directed verdict. The reasons presented in support of those motions were: (1) that the defendant corporation is a charitable institution organized without stockholders and operated without profit to any one, and therefore not subject to damages for the negligence of its employees; (2) that there was insufficient evidence of negligence to entitle the case to go to the jury; and (3) that the treatment of plaintiff which occasioned the injury was by direction and under the instruction of her physician.

We shall first consider the question of whether or not the defendant corporation was, at the time of the injury, a charitable institution. Before referring to the pleadings and the evidence in the case it may be observed that the articles of incorporation are not conclusive as to the character of the business conducted by the corporation. This latter subject will be discussed in detail later in the opinion.

The complaint alleges that on March 20, 1932, the date of the injury complained of, and for a long time prior thereto, the defendant, Corvallis General Hospital Association, was a corporation organized pursuant to the laws of the state of Oregon. To the complaint is attached and made a part thereof a copy of defendant's articles of incorporation. It is alleged that at all times since its organization the defendant

has operated its hospital for hire, and not otherwise; that at no time has it conducted its business for charity or for charitable purposes; that at no time has the defendant received or held "any bonds or thing of value in trust, and does not hold, or has it received the same for trust purposes"; that the hospital has been operated by defendant under a system by which all patients received therein "were compelled to pay the usual charges and fees for services rendered by said hospital that are charged by other hospitals over the state for like services, and at no time, and on no occasion, has the defendant received in said hospital, or cared for at said hospital, any patient for charitable purposes and without cost to such patient"; that at all times since its organization the said hospital has been operated for profit; that said defendant has "never acted or functioned in the governmental and charitable purposes as permitted by its articles of incorporation"; that the whole of defendant's business for a period of years last past has been "devoted to and exercised by the defendant in its proprietary capacity for commercial purposes and for profit"; and that the defendant has exacted charges "for caring for its patients more than fifty per cent in excess of the actual cost thereof to defendant" and has used the profit received from conducting its said hospital business "for its own private profit and gain".

The complaint further alleges that the sole and only purpose the defendant had in organizing as a charitable association was to evade the payment of taxes; that the defendant has made profits in excess of $10,000 a year; that the defendant in its proprietary capacity and "out of the profits of its commercial and proprietary business has created a fund for the protection of those injured" through its negligence, which fund is in excess of the amount claimed by plaintiff in

this case; and that a recovery by plaintiff of the full amount prayed for in her complaint would not in any manner interfere with ''the administration of any trust, affect any trust fund'' or levy upon ''any property, money or thing of value owned or held by defendant for charitable purposes or for trust purposes''.

The defendant is then charged, in the complaint, with negligently and carelessly providing and maintaining in its hospital an improperly constructed electrical device or pad to be used by its employees in applying heat in certain instances to patients being cared for in defendant's hospital; and that this electrical device or pad was by defendant's employees negligently and carelessly applied to and allowed to remain in contact with plaintiff's body, thereby causing the injuries of which she now complains.

In its answer the defendant admits that it is a corporation; that a true copy of its articles of incorporation is attached to the complaint; and that it had rendered its bill for services to the plaintiff. Denial is made of the other allegations of the complaint. As an affirmative defense the defendant alleges that it had been incorporated and operated as a charitable organization; that it has never paid any dividends or profits to any one; and that all its earnings have been devoted to charitable purposes.

The reply denies all the allegations in defendant's further answer and defense, and for a further and separate reply avers that the defendant should be estopped, because of certain facts, from alleging and proving that it is a charitable corporation.

The defendant's articles of incorporation, which are made a part of the complaint and are admitted by the defendant, recite that the Corvallis General Hospital Association was organized under the laws of this state providing for the formation of benevolent, chari-

table and other eleemosynary societies; that the objects, purposes and pursuits of the corporation are to construct and maintain, establish and operate benevolent and charitable hospitals and other institutions for the care of the sick, distressed and injured, to hold and manage real property, and to receive gifts and bequests of personal property and devises of real property; and that its income "will be from gifts, devises, bequests, subscriptions, charges made for services and care to be performed for patients and others in and about the conduct of the business of the association".

Article 4 of the by-laws of the defendant corporation is as follows:

"This association is not formed for pecuniary profit or private gain, and there shall be no stock nor stockholders. Its objects shall be carried out without profit to said association or to the members thereof. All revenue shall be devoted to the carrying out of the general purposes of the association, being the operation of benevolent and charitable hospitals and other institutions for the care of the sick, distressed and injured, together with nurses' homes in connection therewith and to aid those in physical distress, including the payment of current expenses and principal and interest on its indebtedness, if any, and to relief of the poor and needy, indigent patients of the community shall be treated free of charge."

The evidence in the case is to the effect that prior to February 26, 1926, there had been organized under the laws of the state of Oregon a corporation known as Corvallis General Hospital, which was operating a hospital at Corvallis, Oregon. It is conceded that the Corvallis General Hospital was organized for profit. The defendant, Corvallis General Hospital Association, is the successor in interest of the Corvallis General Hospital and acquired all the assets of said former corporation. The transfer of the property to the new

corporation occurred on or about February 26, 1926, at which time the original corporation had a bonded indebtedness of about $40,000, the exact amount of which the witnesses did not know but which was some $32,000 or $33,000 in 1930, and outstanding stock of the par value of $49,620. After this transfer the original corporation was dissolved.

At the time the property of the original corporation was conveyed to its successor, the latter assumed the bonded indebtedness, and on February 26, 1926, made, executed and delivered its note in the sum of $49,620 to the original corporation. This note was due on May 10, 1926, and bore interest at the rate of six per cent per annum after maturity. It contained a provision that it had been executed pursuant to an agreement between the original corporation and its successor for the sale and purchase of the assets of the original corporation, and that the note might "be exchanged at the option of said Corvallis General Hospital Association for its second mortgage income bonds pursuant to the agreement referred to".

Thereafter, second mortgage bonds were issued by the defendant corporation in the amount of said note and were delivered to a trustee to be held for the benefit of the stockholders of the original corporation.

The incorporators and subsequent trustees of the defendant corporation were stockholders of the original corporation, and all or practically all of the trustees of the defendant corporation up to the time of the trial appear to have been stockholders in the first corporation.

During the year 1929 or 1930 the total income of the defendant corporation from the operation of its hospital amounted to between $45,000 and $47,000. Since that time the gross income has decreased annually approximately 12½ per cent from that of the

preceding year, the gross income for 1932 having been $33,000. The defendant has on its books about $25,000 in "open accounts" [unpaid accounts] which have accumulated "since the inception of the business". During the last two years, however, the uncollected accounts have amounted to approximately $1,800 per year.

All moneys received by the defendant corporation have been used in the operation of its institution, in preparing and furnishing additional rooms, in the purchase and installation of new and necessary equipment and in the payment of interest and principal on the first mortgage bonds. At the time of the trial approximately $2,000 had been paid on the principal of the first bonds, and there was delinquent thereon some $1,200. Nothing whatever had been paid on either principal or interest on the second mortgage bonds. No salary or compensation has been paid except to employees for services actually rendered. No fund has been created nor any money set aside by defendant corporation out of which to pay damages to those injured due to the negligence of defendant's employees, contrary to the allegation to that effect in plaintiff's complaint.

The manager of the hospital, at the time of the accident, had received a salary of $225 per month for a brief period, then $200, and still later his salary was further cut, along with that of other employees. The superintendent, who is on duty or subject to call twenty-four hours a day, is paid $125 per month. There is no contention that the institution employs too large a staff or that its employees are overpaid.

. The hospital is a standardized institution, maintaining forty beds. For every patient treated at defendant's hospital a charge has been made, with the

exception of two individuals, each of whom remained there for approximately an hour and a half. Very little was done for either of those patients, both emergency cases.

No one, however, at any time, has been denied admission to, or treatment in, defendant's institution because of race, color, or creed, or inability to pay. In many instances indigent patients have been received by the hospital at the request of the county court of Benton county. For such patients the county pays approximately one-half the amount charged others. From December, 1930, to March, 1933, $2,120.43 was paid by Benton county to the defendant for this service.

The defendant corporation has entered into contracts with numerous industrial concerns for the hospitalization of their employees. In payment for this service the industrial companies turn over to the defendant each calendar month $2 collected from each of their employees, and out of every $2 so received the defendant corporation pays to the state industrial accident commission the employee's contribution of one cent a day. In obtaining such contracts the defendant competes with private hospital associations. Since the accident complained of the defendant corporation has also contracted with the state industrial accident commission for the hospitalization of workmen covered by the workmen's compensation act.

The Corvallis fire department and several fraternal orders have, without charge to defendant, furnished rooms in defendant's institution. Various additional items of the hospital's furnishings have been donated by individuals and clubs, and benefit dances have been given to raise money for the needs of the hospital. The aggregate value of such donations, however, does not amount to any considerable sum in comparison with

the purchase price which the defendant agreed to pay for its grounds and building.

■ The question of whether the hospital is maintained for the purpose of charity of for that of profit is to be determined not only from the powers defined in its. charter but from the manner in which it is conducted: *Stewart v. California Medical Missionary & Benevolent Association*, 178 Cal. 418 (176 P. 46); *Carson v. Schulderman*, 79 Or. 184 (154 P. 903); 30 C. J. 462.

Before taking up and discussing whether or not the hospital conducted by the defendant corporation is a charitable institution, it is well to consider the question of what is, in fact, the function of a charitable or benevolent hospital.

In the case of *Adams v. University Hospital*, 122 Mo. App. 675 (99 S. W. 453), the court in commenting upon the interest which the public has in the maintenance of benevolent institutions, such as hospitals, said:

"Every member of the public is interested in the building up and maintenance of a charitable institution designed for the alleviation of human suffering, and every one may be supposed to be concerned in such institution, and to be a party to a line of action or conduct which would disable every other from doing anything which has a tendency to prevent the institution from performing the functions intended by its founder. The state itself is concerned that its citizens may be restored to health, and to that end may have places always open where those in need may obtain relief. So it may be said that any citizen who accepts the service of such institution (it making no difference whether in any special instance he pays his way) does so upon the ground, or the implied assurance, that he will assert no complaint which has for its object, or perhaps we should say, for its result, a total or partial destruction of the institution itself. If an organization for charitable purposes founded upon the bounty of others

who supply funds for the purpose of administering relief to those in need of relief, and of extending aid, care, and protection to those who have no one to call upon by the ties of nature, may have its funds diverted from such kindly purpose, would it not inevitably operate to close the purses of the generous and benevolent who now do much to relieve the suffering of mankind?''

The overwhelming weight of authority is to the effect that a hospital association organized and conducting its business as a charitable institution is not liable for injuries suffered by its patients due to the negligence of its employees. The courts, however, are not in accord in the theories advanced for such immunity. Most of the decisions are based on one or more of the three following premises, to wit: (1) the doctrine of implied waiver; (2) the trust fund theory; and (3) that of public policy. The courts which base their decisions on implied waiver hold that one who accepts the benefits of either a public or a private charity impliedly exempts the charitable institution from liability for the negligence of its servants in administering the charity. The trust fund doctrine holds that a trust fund can not be used to compensate an injured patient for the negligence of the agents or servants of a charitable hospital, otherwise the trust fund would be diverted to purposes never intended and would thereby be depleted. The public policy theory is based on the reasoning that, inasmuch as charitable hospitals derive no profit from their work and are founded for the sole purpose of conserving the health and life of all who need their aid, justice and sound policy alike dictate that they should be exempt from the liability attaching to those engaged in enterprises for profit.

As said by the supreme court of Nebraska, in *Sibilia v. Paxton Memorial Hospital,* 121 Neb. 860 (238

N. W. 751), in reference to the nonliability of charitable institutions and the theories advanced by courts relative thereto: "It does not seem necessary to discuss again the reason for the rule or the conflicting theories. It has been so exhaustively discussed by courts, text writers and annotators that we forego the opportunity to enter this inviting field of theoretical discussion."

For authorities holding that charitable institutions are not liable for the torts of their employees, see the following: *Powers v. Massachusetts Homeopathic Hospital*, 109 Fed. 294 (65 L. R. A. 372); *Williams v. Church Home*, 223 Ky. 355 (3 S. W. (2d) 753, 62 A. L. R. 721); *Schloendorff v. Society of New York Hospital*, 211 N. Y. 125 (105 N. E. 92; 52 L. R. A. (N. S.) 505, Ann. Cas. 1915C, 581); *Brown v. St. Luke's Hospital Association*, 85 Colo. 167 (274 P. 740); *O'Neill v. Odd Fellows Home*, 89 Or. 382 (174 P. 148).

■ In all, or practically all, the cases holding that charitable institutions are immune from liability for the negligence of their servants the reasoning is based on the ground that the institutions derive their funds mainly from public or private charity and that their trustees are charged with the duty of administering such funds exclusively for the charitable uses for which they have been donated. In referring to the various decisions of the courts holding that such institutions are exempt from liability, the supreme court of New Hampshire in *Hewett v. Women's Hospital Aid Association*, 73 N. H. 556 (64 Atl. 190; 7 L. R. A. (N. S.) 496), remarked:

"It should be noted in this connection that the defendant was not incorporated for the purpose of carrying out the provisions of an express trust in reference to property or money donated under a limited deed of trust. It holds its property under its charter for the

general purposes of a hospital. It is a charitable institution whose powers and duties in the management and expenditure of its funds are unlimited, except so far as they are governed and defined by the general charitable purposes of its incorporation. It is therefore unnecessary to consider what its legal liability might be if it held funds upon a trust which expressly or by necessary inference exempted them from being appropriated to the payment of damages suffered through the negligence of its officers or servants. Many of the cases which either hold or state argumentatively that a charitable body is not liable for its torts proceed upon the theory that its funds are held upon a special trust, that to use them for the payment of damages in an action of tort against it would be an unwarranted diversion thereof, and that such an action is not maintainable, because it would be entirely futile.''

In *William Budge Memorial Hospital v. Maughan,* 79 Utah 516 (3 P. (2d) 258), the question arose whether or not a certain hospital corporation was exempt from the payment of taxes for the reason that it was, as contended by its officers, a charitable institution. Although it had been organized as a stock corporation, officers of the corporation contended that it was in fact a charitable organization. In the course of its decision the supreme court of Utah observed:

"Up to this time there is no claim that it received any gifts, bequests, or endowments, either absolutely or impressed with any kind of a trust, to be used for the construction, support, and maintenance of this or any other hospital. It had nothing more than what was paid in by its stockholders for the payment of their stock, which, so far as the record shows, was $40,240.''

Later on in the opinion, in referring to what constitutes a charitable institution, the court said:

"We are unable to find a single distinctive charitable feature that marks the plaintiff's hospital as a

charitable institution. 'A charity is a gift to the general public use which extends to the rich as well as to the poor. The test of a charity and the test of a charitable organization are in law the same. The principal and distinctive features of a charitable organization are that it has no capital stock and no provision for making dividends or profits, but derives its funds mainly from public and private charity, and holds them in trust for the objects and purposes expressed in its charter.' Congregational Sunday School & Publishing Soc. v. Board of Review, 290 Ill. 108 (125 N. E. 7, 10); 11 C. J. 303.

"The capital obtained by the payment of stock subscriptions for stock in a private corporation organized as a business corporation to establish and maintain a hospital is entirely a different thing, in law, from a fund created by the contributions of benevolent and charitably minded persons with the object of establishing and maintaining a hospital as a nonprofit corporation."

In 11 C. J. at page 303 we find the following statement:

"Charitable associations, corporations, or institutions are such as are constituted for the perpetual distribution of the free alms of the founders of, and the contributors to, them, to such purposes and in such manner as they have directed. Their principal aim is to benefit needy ones in other ways than by improving their morals, and sometimes a corporation formed for the purpose of accomplishing the moral reformation of a certain class of people is treated as a charitable institution. Their principal and distinctive features are that they have no capital stock and no provision for making dividends or profits, but derive their funds mainly from public and private charity and hold them in trust for the object of the institutions. In other words, the test of whether an enterprise is charitable is whether it exists to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit, or private advantage."

A charitable organization is defined in 5 R. C. L., page 373, as follows:

"A corporation, the object of which is to provide a general hospital for sick persons, having no capital stock nor provision for making dividends or profits, deriving its funds mainly from public and private charity, and holding them in trust for the object of sustaining the hospital, conducting its affairs for the purpose of administering to the comfort of the sick, without expectation or right on the part of those immediately interested in the corporation to receive compensation for their own benefit, is a public charitable institution."

■ The plaintiff practically concedes that if the defendant was organized and is operating as a charitable institution it is not liable to plaintiff for the injuries which she suffered. It is, however, contended by plaintiff that the defendant, although apparently organized as a charitable institution, is being conducted as a profit-making enterprise in the interest of the holders of its second mortgage bonds, and that the corporation was organized under the laws relating to eleemosynary institutions as a subterfuge to evade the payment of taxes. In support of the contention that defendant is not a charitable institution, attention is further directed to the fact that few, if any, donations have been made to the institution; that every patient is charged for services rendered, even though many patients have never paid anything on account; that contracts have been made with industrial concerns, by the defendant corporation, for the treatment of sick and injured employees, in competition with commercial hospital associations; and that the indigent are, in practically all instances, before being received by defendant's hospital, referred to the county court to obtain permission for treatment at the expense of the

county. As already pointed out, only two minor cases have been treated by the defendant corporation without charge. Even in instances in which those connected with the hospital testified that the patients treated were, in their opinion, unable to pay, charges were made for the services rendered by the defendant corporation.

The contracts between the defendant corporation and industrial concerns for care and treatment of employees of the latter companies provided for medical and surgical services, hospital services such as bed, board, medicine, dressing, X-ray diagnosis, clinical laboratory examination, physio-therapy, private nurses and dental services, also for nonhospital services such as assistance to patients in making out reports to the state industrial accident commission, ambulance service, furnishing first-aid materials and supplies, home service, sanitation of factories or plants, and other services. In carrying out these contracts it necessarily devolved upon the defendant to employ medical, surgical and dental assistance. At the time of the trial the defendant corporation was indebted some $2,500 to physicians and surgeons for services rendered in performance of these contracts and had only $1,200 to $1,400 with which to pay such accounts. The hospital association was also carrying on its books from $1,500 to $1,800 in unpaid accounts due it from insolvent and bankrupt industrial concerns.

Those contracts were entered into, as previously stated, in competition with private concerns, for the expected profit to be realized therefrom by the hospital association. Much of the service which was agreed to be furnished by the defendant corporation was to be rendered outside its hospital.

Mention has heretofore been made of donations. from fraternal orders and others. Fraternal orders had donated furnishings for rooms in the hospital during its private ownership and continued their donations by refurnishing the same rooms after the hospital was taken over by the defendant corporation. Other donations consisted of a baby crib or cribs, a hall clock, cash proceeds of a benefit dance, less than $200, for equipping a laboratory, and $163 given by the superintendent to pay for a tile floor.

The fact that the trustees who are now operating the defendant corporation were stockholders in the former organization and now hold second mortgage bonds to the extent of their stock ownership, and the further fact that there is approximately $50,000 in second mortgage bonds owned by the stockholders of the former corporation, would have a tendency to deter donations to the institution, for the reason that no one would want to make any notable contribution, knowing that the former stockholders would, after the first mortgage was paid, virtually own the hospital plant, due to the mortgage which secures to them the amount of their stock holdings.

The by-laws of the defendant corporation, introduced in evidence at the instance of the defendant, provided, among other things, that "indigent patients of the community shall be treated free of charge", yet in not a single instance, with the exception of the two minor cases hereinbefore mentioned, were any patients, indigent or otherwise, treated without charge.

The $25,000 in unpaid accounts hereinbefore referred to is apparently an accumulation of the unpaid accounts of both the prior corporation and the present association, as the only testimony concerning those accounts was to the effect that $25,000 in unpaid bills

had accumulated "since the inception of the business". The unpaid bills on defendant's books for services rendered during the last three years aggregate between $5,000 and $6,000, and of this amount the delinquent accounts averaged $1,800 for each of the last two years. It is doubtful that the balance of accounts in arrears, approximately $20,000, could be chargeable to the operation of the defendant corporation during the two years and ten months prior to 1930.

Although the record does not indicate definitely the financial condition of the former corporation at the time its assets were transferred to the defendant corporation, it can easily be inferred therefrom that its business was a losing enterprise. The evidence, however, is explicit to the effect that the succeeding corporation was organized for the purpose, among other things, of escaping the payment of taxes. There is also evidence to the effect that the prior corporation was doing a great amount of charitable work.

We are of the opinion that the trial court did not err in submitting to the jury the question of whether the defendant corporation was a strictly charitable institution or was being operated for profit in the interest and for the benefit of the stockholders of the prior corporation, after those stockholders had become the owners and holders of approximately $50,000 worth of defendant's second mortgage bonds. In view of the record it can not be said that the defendant corporation was strictly a charitable organization. It is not necessary to reiterate the facts hereinbefore pointed out from which the jury might at least infer that the defendant corporation was being operated for the benefit of certain individuals. The question of whether the defendant corporation was a charitable institution or was being conducted for profit was, by appropriate

instructions, submitted to the jury and no exception was taken to those instructions.

In the case of *Corporation of the Sisters of Mercy v. Lane County,* 123 Or. 144 (261 P. 694), this court, in referring to the facts in that case, said that the evidence showed that the institution was conducted "without profit to its founders and the officials in charge". Apparently the stockholders of the predecessor corporation, in the case at bar, in making the transfer to the new corporation dealt with some of the stockholders of the former corporation who had become the founders and trustees of the suceeding organization. From the evidence it might be inferred that one of the principal purposes in forming the new corporation was, through the elimination of taxes and other expenses, to enable the stockholders of the former corporation to be repaid the par value of their stock. By this arrangement such stockholders became preferred creditors, whereas under the original plan their rights had been subordinate to those of all creditors.

The failure of the defendant corporation to make a profit during these times of depression does not in any way tend to prove that it is a charitable organization. Very few corporations, although organized solely for the purpose of private gain, have, during the past few years, been able to show a profit, and yet they are not in any way to be classed as eleemosynary institutions. Moreover, a considerable amount of defendant's losses might be charged to the insolvency of industrial concerns with which it had contracted to render the services hereinbefore described.

An important feature of this case is the absence of any charitable trust for the defendant to administer. There is no income from a fund or funds created by "contribution of benevolent and charitably minded persons" to be used by the association in relieving

the distress of the needy. Even the trustees of the association have a personal interest in the operation of the institution.

As pointed out in 11 C. J., supra, the principal and distinctive characteristics of charitable institutions are that they "derive their funds mainly from private and public charity and hold them in trust for the object of the institution. In other words, the test of whether an enterprise is charitable is whether it exists to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit, or private advantage". "However, if the hospital is conducted for profit, although receiving free of charge patients unable to pay, it is not a charitable institution": 30 C. J. 462.

There was enough competent evidence in the case to warrant the jury in finding that the nurses in charge of plaintiff were acting as the servants of the defendant corporation rather than as servants of the attending physician: *Williams v. Pomona Valley Hospital Association,* 21 Cal. App. 359 (131 P. 888). *Aderhold v. Bishop,* 94 Okl. 203 (221 P. 752, 60 A. L. R. 137), is not applicable to the facts in the present case.

■ As to the contention of the defendant that there was insufficient evidence of negligence on the part of employees of the defendant corporation to entitle the case to go to the jury, it is sufficient to say that the injuries suffered by the plaintiff occurred while she was in an unconscious condition in the care of employees of the defendant. It was a question of fact for the jury to determine whether the burns received by her were or were not due to the negligence of those employees.

Since we find no error in the record, the judgment appealed from is affirmed.

RAND, C. J., BEAN and CAMPBELL, JJ., concur.