IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

SERENITY LANE, INC. and )
SERENITY LANE HEALTH SERVICES, )
 )
            Plaintiffs, ) TC-MD 101243C
 )
     v. )
 )
LANE COUNTY ASSESSOR, )
 )
            Defendant. ) **DECISION**

Plaintiffs appeal the denial of a property tax exemption for property identified as

Accounts 1279098, 1480449, 0287274, 0287373, 0287290, and 1279106 (subject properties) for

the 2010-11 tax year.  Plaintiffs filed a Complaint on November 5, 2011, challenging

Defendant's removal of the subject properties' tax exempt status.

Trial in this matter was held on July 27, 2011.  Dennis W. Percell (Percell), Attorney at

Law, Arnold, Gallagher, Percell, *et al.*, appeared on behalf of Plaintiffs.  Marc Kardell (Kardell),

Assistant County Counsel, appeared on behalf of Defendant.  Peter J. Asmuth (Asmuth), Chief

Executive Officer (CEO) of Serenity Lane, Michael U. Dyer (Dyer), Chief Financial Officer of

Serenity Lane, and Monica Oss (Oss), CEO of Open Minds, testified on behalf of Plaintiffs.

Walter Rosenthal (Rosenthal), Lane County Clinical Services Supervisor, Mike Cowles

(Cowles), Senior Sales Data Analyst for Defendant, and Daniela Urbatzka (Urbatzka), Property

Tax Manager for Defendant, testified on behalf of Defendant.  At trial, Defendant submitted a

Trial Memorandum, Plaintiffs submitted a Trial Brief, and the parties jointly submitted a written

statement titled Stipulation of Facts.  Plaintiffs' Exhibits 1 through 14 and Defendant's Exhibits

A through V were submitted without objection.  Defendant also submitted Rebuttal Exhibits R1

through R9.

# I. STATEMENT OF FACTS

Plaintiff Serenity Lane, Inc. (Serenity) has operated a substance abuse treatment facility in Lane County since 1973. (Ptfs' Trial Br at 1.) Plaintiff Serenity Lane Health Services (Serenity Lane HS) is the owner of the subject properties; Serenity is the lessee. (Ptfs' Compl at 1.) At trial, Asmuth testified that Serenity's Eugene, Oregon, campus consists of several buildings: a hospital, several office buildings, a remodeled home with counseling rooms and office space, a young men's group home, and other residential facilities. Serenity "provides services to Oregon residents consisting of medically supervised withdrawal; 14, 21[,] and 28 day residential treatment; extended stay programs; intensive outpatient treatment; recovery support[;] and DUII services." (Ptfs' Trial Br at 1.)

At trial, the parties submitted the following written stipulated facts,[1] which states, in pertinent part:

"1. Serenity Lane [HS] is a non-profit corporation organized in the state of Oregon as a charitable corporation. * * *.

"2. Serenity * * * is a non-profit organization organized in the state of Oregon as a charitable corporation. * * *.

"3. Serenity Lane [HS] and Serenity * * * are exempt under the Federal Income Tax Code Section 501(c)3.

"4. Serenity Lane [HS] owns and Serenity * * * rents from Serenity Lane [HS] the real property at issue herein. Serenity Lane [HS] provides administrative support for Serenity * * *[.] Serenity * * * provides treatment and recovery services for substance abuse at the [subject] properties.

"5. From the inception of Serenity * * * in 1973 until June 30, 2010, [the subject properties were] exempt under ORS 307.130.

"6. On August 19, 2010, the Lane County Assessor's Office gave notice to [Plaintiffs] that it was removing their exemption status [for the 2010-11 tax year].

---

[1] Although the parties signed a document entitled "Stipulation of Facts," there are various figures within the document that show the parties do not agree.

"* * * * *

"8. * * * Plaintiffs are supported largely by fees collected from treatment services. For their fiscal year [ending (FYE)] March 31, 2009, this revenue was $12,492,202 and for their [FYE] March 31, 2010, the amount was $12,384,067. Serenity * * * reports charitable donations through free and reduced fee services for * * * 2009 of $253,379 and for * * * 2010 that sum is $261,973/$273,149. * * * [I]f an individual were to be unable to pay for the services, Plaintiffs may provide charitable care to the individual.

"9. As part of the [Plaintiffs'] 'Charity Care' policy, adopted March 24, 2009, its Board is to approve in the annual budget a target amount of charity care to be provided.

"10. Plaintiffs' 2009 balance sheet reflected current assets of $5,216,754, net assets of $14,927,670, revenue of $12,763,321, and expenses of $11,897,758.

"11. * * *. For [FYE] March 2010, Plaintiffs provided $261,973 worth of charitable care to 188 patients at all levels of care * * *. Plaintiffs track this charitable care as 'donation income.' * * *. Plaintiff's now report for the same time period the sum of $273,149 worth of charitable care.

"12. [Plaintiffs] assert[] that other services [provided] may be characterized as charitable. While [Defendant] does not contest that these activities were performed, or the rate of compensation attributed to the various people who performed the activities, the [Defendant] contends that the activities are not clearly charitable in nature. The total * * * is $228,575. * * *.

"13. There is a second category that [Defendant] disputes the applicability of, but not the dollar amount involved. That category deals with what may either be termed discounts or write downs representing the difference between amounts [Plaintiffs] receive[] from the Oregon Health Plan [(OHP)]for treatment services, versus [] advertised charges. [The total for 2009] is $413,968/$615,719 and for * * * 2010 is $458,163/$431,250.

"14. Plaintiffs have published a 2011 brochure which provides examples of the charitable care they deliver. In that publication is 'Don's Story.' That describes Plaintiffs' ability to successfully treat this homeless and indigent individual.

"15. [Defendant] contests no legal issues concerning Plaintiffs' exemption status other than [Plaintiffs'] charitable giving related to their overall activities."

(Stip Facts at 1-3 (citations omitted).)

/ / /

Asmuth testified that Serenity's programs are voluntary and are abstinence based. According to Asmuth, Serenity performs approximately 3,500 intake assessments per year,[2] and once an individual is part of a program, the participant is subject to a rigid schedule with set times for lectures, groups therapy sessions, and meals. Asmuth testified that because the programs utilize group therapy where trust is key, Serenity is unable to serve adults with dual diagnoses.

Asmuth testified that Serenity's business model is one of "fiscal stewardship." According to Asmuth, Serenity invests any excess revenue back into the program to ensure ongoing operation with consistent, quality services. He also testified that Serenity is not funded by government sources, claiming that such funding is unreliable and leads to facilities closing. Asmuth testified that Serenity maintains approximately four months of operational reserves and does so because the practice is fiscally responsible.

In terms of the prices charged for Serenity's services, Asmuth testified that Serenity does not set a high price, then just offer discounts to those in need; rather, Serenity sets the price as low as possible so that most Oregonians can be served. (*See* Ptfs' Ex 9.) In a survey of regional addiction treatment program rates, Serenity reported the set charges for various levels of care. (Ptfs' Ex 10 at 4.) The charge is $1,295 per day for the medical detoxification program, $11,900 total for the 28-day inpatient/residential program, $4,860 total for the ten-week outpatient addiction treatment and recovery support program, and $6,496 per 30 days for long-term residential addiction treatment. (*Id.*) Asmuth acknowledged that medications are part of the cost of the daily program fee for those that are patients in the campus hospital; participants of other

---

[2] Asmuth acknowledges that these assessments are free except for mandated assessments and assessments of OHP recipients. (Def's Ex I at 1.) The non-free assessments comprise 15-20 percent of the total assessments performed. (*Id.*) Asmuth acknowledged that the value of each assessment is $150. "The estimated staff cost of each assessment is $50-$75." (*Id.*)

programs are charged for medications separately. Asmuth also testified that Serenity does dispense medication for free if it is medically necessary and the patient is unable to pay. As of December 1, 2007, Serenity also offered "Package Pricing" that is "the least amount [Serenity] offer[s] for these services." (Def's Ex K at 1.) These prices range from $9,750 for 14 days of the residential program, participation in the intensive outpatient program, and participation in recovery support to $23,690 for 28 days of the residential program, 60 days of the "ExSL" program, participation in the intensive outpatient program, and participation in recovery support. (*Id.*)

As testified by Asmuth, Plaintiffs' charity falls into the categories of donations, volunteer time, OHP subsidies, and community service. (*See also* Ptfs' Ex 8.) Asmuth testified that Plaintiffs' donate by offering scholarship aid for treatment and through their lower-than-average market rates (Ptfs' Ex 11 at 1; Def's Ex D at 1.) According to Asmuth, Plaintiffs have three sets of volunteers: the capital task force contributes 400 to 500 hours of volunteer time each year; Plaintiffs' seven Board members contribute 420 hours each year, collectively; and each of the 10 to 15 interns contribute 2080 hours of volunteer time each year. (*See* Ptfs' Ex 8 at 2.) Asmuth also testified that the time the interns contribute counts towards their certified alcohol drug counselor (CADC) accreditation. Asmuth also testified that Plaintiffs developed a free program to provide substance abuse awareness training to local employers (large and small), the police, and other government entities. (Ptfs' Ex 12.) Asmuth testified that Plaintiffs provide these trainings as a part of their philosophy to eradicate substance abuse, not for advertising purposes. Asmuth also testified that some of these trainings are conducted outside of Lane County. (*See* Def's Ex F at 2.)

/ / /

Amsuth testified that Plaintiffs' services help relieve a government burden. (*See* Ptfs' Ex 14.) Plaintiffs state that Serenity "provides a valuable public benefit and relieves a significant government burden[,]" as the Oregon Legislature's Governor's Council on Alcohol and Drug Abuse Programs found a " 'lack of access for substance abuse treatment services continues to be a major hindrance for improving the health of Oregonians.' " (Ptfs' Trial Br at 2.)

The scholarship program at Serenity is called "charity care." (Def's Ex D at 3.) The purpose of charity care is "[t]o allow a mechanism where a finite number of patients who are otherwise appropriate for treatment but who lack sufficient financial resources, have access to services at Serenity * * *." (*Id.*) Asmuth testified that for the tax year at issue (2010-11), Serenity's board of directors (Board) designated three percent of Serenity's normal billed charges for charity care scholarships. Plaintiffs' charity care procedure states, in pertinent part:

> "Each year the Board * * * will set a target amount of charity care to be provided. This amount will be based on normal billed charges.
>
> "* * *. It is not required that charity care be applied to all levels of services provided by Serenity * * *.
>
> "* * * * *
>
> "Candidates for charity care may be required to provide written verification of their financial hardship. * * *.
>
> "No further efforts will be made to collect amounts identified as charity care. However, should a payment be received on an amount previously identified as charity care, the payment may be retained. Serenity * * * may continue to attempt to collect amounts not identified as charity care owed by patients to whom some charity care has been approved.
>
> "Should the information on which the decision to grant charity care was based later be determined to be false or incorrect, [Serenity] may revoke the charity care discount, and billing may recommence.
>
> "Special non-financial conditions may be set for the granting of charity care to a specific patient. Should those conditions not be met, the offer of charity care may be revoked and collection efforts may recommence."

(*Id.* at 3-4 (emphasis omitted).)  Asmuth acknowledged that that if charity care scholarships amounted to less than three percent in a given year, the shortfall is not carried forward to the following year.  (Def's Ex D at 4.)

Asmuth also acknowledged that if Serenity has reached the Board's designated amount of charity care for a given year, Serenity will not treat an indigent person at a reduced rate; rather, Serenity will refer the person to another treatment facility, or may "do some outpatient treatment."  Asmuth testified that Serenity serves the indigent where appropriate, but conceded that Serenity rarely treats the indigent because often the indigent have needs beyond the scope of Serenity's capacity to serve, and because, if the therapy is to work, there needs to be homogeneity within programs.  Serenity has provided free treatment to one individual, Asmuth said, and has published this account in a brochure entitled "Don's Story."

Dyer provided information to Defendant about how patients are made aware of charity care.  (*Id.* at 1.)  Dyer wrote that:

> "[o]ur staff has met with the * * * agencies that deal with the indigent and other financially challenged clients to discuss the availability of charity care. * * *. [M]any of our patient[s] * * * do not indicate they are in financial hardship until they get a bill.  We then work [with] them to assess their financial condition.  If they document their financial distress, we reduce their bill after the fact."

(*Id.*)  Dyer testified that Serenity receives one or two applications per week for charity care.  Dyer also testified that if an application is denied, the patient is notified; however, Serenity continues to serve denied applicants and does its best to collect its fee.  Serenity does not take Medicare patients.

Concerning OHP recipients, Asmuth testified that Serenity subsidizes their care, noting that Plaintiffs are not obligated to do so.  Asmuth testified that Serenity considers the difference between the regular price of its treatment services and its lower

reimbursement from OHP as charity. Combining those who received scholarships through charity care with those who received the OHP subsidy, nine and one-half percent of admitted patients received a reduced rate[3] for FYE March 31, 2011; 10.2 percent received a reduced rate in FYE March 31, 2010. (Ptfs' Ex 11 at 1.)

Asmuth also testified about Plaintiffs' commissioned "Survey of Regional Addiction Treatment Program Rates." (Ptfs' Ex 10.) He testified that of the approximately 80 area treatment programs, Serenity is the only program that is jointly accredited and has full-time physicians and nurses on staff. Oss testified that Open Minds has performed 40 to 50 such rate surveys, both for government entities and the private sector. Oss described the survey process: 1) identify services from the various packages that Serenity offers; 2) identify the survey sample (here, Joint Commission on Accreditation of Healthcare Organizations (JCAHO) certified providers with similar services in contiguous states);[4] 3) design the survey; 4) distribute the survey; and 5) collect the data. Oss testified that the data is collected, in part, via telephone in a "guided interview." (*See id.* at 23.) Of the 80 treatment centers identified in the sample, the responses for each type of service ranged from six responses to 17.[5] Oss testified that the survey results showed that Serenity's prices were 24 percent below market average for its medical detoxification program, 35 percents below market average for its 28-day inpatient residential program, 29 percent below market average for its ten-week outpatient addiction treatment and recovery support program, and 58 percent below market average for the long-term residential

---

[3] While approximately 10 percent of patients received a lower rate, virtually all patients have paid some amount for their treatment.

[4] "The addiction treatment programs of all JCAHO-accredited health care organizations in the western region of the United States – Oregon, Washington, California, and Nevada – were included in the survey." (Ptfs' Exhibit 10 at 3.)

[5] There were 15 treatment facilities that participated in the survey as to rates for a medical detoxification program, 10 for the 28-day inpatient/residential program, 17 for the ten-week outpatient addiction treatment and recovery support program, and six for the long-term residential addiction treatment. (Ptfs' Ex 10 at 5.)

addiction treatment. (*See id.* at 4.) According to the survey, for each of the four treatment programs, Serenity ranked ninth of 16, fourth of 11, fourth of 18, and first of 7, respectively (with first being the lowest reported price). (Ptfs' Ex 10 at 6-9.) Oss acknowledged that there were no adjustments to average market prices for different attributes at various facilities. Dyer acknowledged that Serenity could not charge the average market rate determined by the survey; if Serenity raised rates to the average market rate, Dyer stated that Serenity would wind up out of business.

Plaintiffs contend that their charity is in the form of lower-than-average market rates charged for their treatment services, charity care scholarships, the OHP subsidies, and community service. (Ptfs' Ex 8 at 1.) By Plaintiffs' figures, their total charity is 57.1 percent of patient revenues for tax year 2010-11. (*Id.*) Defendant disagrees with the average market rate determined by the survey, and it disagrees that any difference between Serenity's rates and the average market rates constitutes charity, noting that, by its own admission, Serenity would not be a viable enterprise at the survey's average market rates. Defendant also disagrees with Serenity's claim that its community service in the form of interns' volunteer time counts as charity, noting that interns receive a stipend and credit towards future marketable credentials. Defendant further argues that the community service efforts by Serenity should not be counted as charity because the community service occurs outside of Lane County. Finally, Defendant seems to concede that the scholarship amounts through charity care are charity, but that three percent is not enough to constitute a gift or giving. Defendant further asserts that Serenity generated a profit for fiscal years 2008, 2009, 2010, and 2011, and spends $400,000 per year or more in advertising, which appears to be more than it allocates for scholarships.

/ / /

## II. ANALYSIS

Under ORS 307.030, all real property in Oregon is taxable unless specifically exempted.[6]

ORS 307.030 states, "(1) All real property within this state * * * except as otherwise provided by law, shall be subject to assessment and taxation in equal and ratable proportion." Plaintiff seeks exemption under ORS 307.130 as a charitable organization.

ORS 307.130 provides in relevant part:

"(2) Upon compliance with ORS 307.162, the following property owned or being purchased by art museums, volunteer fire departments, or incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(a) Except as provided in ORS 748.414, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."

When looking at statutes granting exemption, the court is guided by the principle that "[t]axation is the rule and exemption from taxation is the exception." *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev*. (*Dove Lewis*), 301 Or 423, 426, 723 P2d 320 (1986). Property tax exemption statutes are strictly but reasonably construed. *SW Oregon Pub. Def. Services v. Dept. of Rev*. (*SW Oregon*), 312 Or 82, 88–89, 817 P2d 1292 (1991). "Strict but reasonable construction does not require the court to give the narrowest possible meaning to an exemption statute. Rather, it requires an exemption statute be construed reasonably, giving due consideration to the ordinary meaning of the words of the statute and the legislative intent." *North Harbour Corp. v. Dept. of Rev*., 16 OTR 91, 95 (2002) (citation omitted). Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

---

[6] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OARs) are to 2009.

To qualify as a charitable institution, an organization must: "(1) * * * have charity as its primary, if not sole, object; (2) * * * be performing in a manner that furthers its charitable object; and (3) * * * [its] performance must involve a gift or giving." *SW Oregon*, 312 Or at 89. All three conditions must be met to qualify as a charitable institution within the meaning of ORS 307.130. *See Mazamas v. Dept. of Rev.*, 12 OTR 414, 415 (1993). The test is applied to the overall activities of Plaintiffs, not a portion thereof. *See Mercy Medical Center, Inc. v. Dept. of Rev.*, 12 OTR 305, 307 (1992).

A. *Charitable object and performance furthering the charitable object*

The first prong of the *SW Oregon* test requires that Plaintiffs have "charity as its primary, if not sole, object." *SW Oregon*, 312 Or at 89. The Oregon Department of Revenue adopted a rule, OAR 150-307.130-(A), "that established criteria to be used in determining qualification for an exemption under ORS 307.130." *Id*. at 86. OAR 150-307.130-(A)(3)(b) states that "[t]he activity conducted by the charitable institution must be for the direct good or benefit of the public or community at large." The second prong of the *SW Oregon* test requires that Plaintiffs must "be performing in a manner that furthers [their] charitable object." *SW Oregon*, 312 Or at 89. OAR 150-307.130-(A)(3)(b) states that "[p]ublic benefits must be the primary purpose rather than a by-product. An organization that is established primarily for the benefit of its members, is not a qualifying charity." In analyzing the first element, courts have looked to an organization's purpose as stated in its articles and bylaws. *See Dove Lewis* at 427 (citing *Found. of Human Understanding v. Dept. of Rev.*, 301 Or 254, 722 P2d 1 (1986) (articles); *Hamilton v. Corvallis Hosp. Ass'n.*, 146 Or 168, 171-72, 30 P2d 9 (1934) (articles and bylaws).

Plaintiffs are non-profit corporations organized in Oregon as charitable corporations. (Stip Facts at 1.) Serenity Lane HS' articles of incorporation state that "[t]his corporation is

intended to be a charitable corporation * * *." (Ptfs' Ex 2 at 1.) Serenity's restated articles of incorporation state words to the same effect. (*See* Ptf's Ex 1 at 4.) Serenity is operated "[t]o provide medical care, education, treatment and counseling for persons suffering from alcohol and chemical addiction, abuse and dependence; * * * [and to] promote and carry on such other related charitable activities * * *." (*Id.*) Plaintiffs' are recognized by the Internal Revenue Service as income tax exempt; do not operate for the benefit of any private shareholder or individual; and their respective articles of incorporation provide that should either dissolve its assets, they will be used for charitable purposes. (Stip Facts at 1; Ptfs' Ex 1 at 4-5; Ptfs' Ex 2 at 1-2.)

In *Hazelden Springbrook v. Yamhill County Assessor* (*Hazelden*), TC-MD 031037D, WL 1237628 (May 11, 2004), the Plaintiff was a substance abuse treatment center offering "services for adults who struggle with substance abuse and alcohol and drug addiction." *Hazelden*, WL 1237628 at *1 (May 11, 2004) (internal quotations omitted). The issue in *Hazelden* was whether the work carried on at the property was charitable. *Id.* at *4. The court discussed the second prong of *SW Oregon*, noting that the services provided to paying patients "do not further [Plaintiff's] charitable objective of promoting social welfare and the common good for others not paying for the services." *Id.* at *5. The court noted that without "a list of speakers with dates and locations of their presentations, a list of community outreach programs * * * participated in," the court could not conclude that the Plaintiff's activities furthered its charitable objective. *Id.*

In the present case, Plaintiffs' efforts to treat those suffering from alcohol and chemical addiction, abuse and dependence are activities for the public good. In addition, Plaintiffs' participate in community service and provided a list of speakers with dates and locations of their

presentations to demonstrate furtherance of a charitable objective. Thus, the court finds that the first two prongs of the *SW Oregon* test are satisfied.

### B.    *Gift or Giving*

In reviewing Plaintiffs' purpose and activities, the focus is placed on their "performance" involving "a gift or giving." *SW Oregon,* 312 Or at 89 (citation omitted). The element of gift or giving "is what distinguishes charity from nonprofit." *Samaritan Village*, TC-MD No 001064C at 8. With respect to gift or giving for a "fee-charging operation," like Serenity, OAR 150-307.130(c) lists four factors considered by the Oregon Supreme Court in its holding in *Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 309-310, 360 P2d 293 (1961). OAR 150-307.130-(A)(3)(d) provides in relevant part:

> "An element of gift and giving must be present in the organization's activity, relating to those it serves. This element of gift and giving is giving something of value to a recipient with no expectation of compensation or remuneration. Often, a charitable organization's product or service is delivered to recipients at no cost or at a price below the market price or price to the organization of the product or service. * * *.
>
> "* * * * *
>
> "* * * * *
>
> "(C) The fact that an organization charges a fee for its services does not necessarily invalidate its claimed status as charitable. It is a factor to be considered in the context of the organization's manner of operation. In determining whether a fee-charging operation is charitable, it is relevant to consider the following:
>
> "(i)  Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed;
>
> "(ii)  Whether patients or patrons receive the same treatment irrespective of their ability to pay;
>
> "(iii)  Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed;

"(iv) Whether charges are made to all and, if made, are lesser charges made to the poor or are any charges made to the indigent."

Plaintiffs contend that their charity is in the form of charity care scholarships, OHP subsidies, lower-than-average market rates charged for their treatment services, and community service. However, the court disagrees that these efforts satisfy "a gift or giving" for the reasons set forth below.

There is no bright line rule governing whether a specific amount of aid constitutes a gift or giving. In *Hazelden*, the court stated "[a]lthough a bright line test for giving has not been determined, * * * giving is absent when the scholarships or reduced fee in relation to the fee charged is less than eight percent. *Id.* at *6 (citing *YMCA v. Dept. of Rev.*, 308 Or 644, 654, 784 P2d 1086 (1989)).

Defendant concedes, and the court agrees, that charity care scholarships are the type of fee service supplementation that could satisfy the element of a gift or giving. However, as Plaintiffs report, this amount is capped at three percent. In fact, Asmuth acknowledges that once the three percent cap is reached, lesser charges would not be made to a poor or indigent person who could not afford Serenity's services. As for the OHP subsidies, Plaintiffs did not report a cap on those amounts, but those totals amount to roughly one-third of the amount allowed for charity care. (*See* Ptf's Ex 8 at 1.) Even if the court were to consider the OHP subsidies, combining those with charity care, the total amount "donated" by Serenity falls short of eight percent. In total, only about ten percent of Serenity's patients receive a reduced rate. (Ptfs' Ex 11 at 1.) Importantly, Plaintiffs report that only one individual received treatment for free (*ie.* "Don's Story").

To overcome this deficit, Plaintiffs' argue that the difference between Serenity's rates and the average market rate determined by the survey constitute a gift or giving. The rule states

that "[o]ften, a charitable organization's * * * service is delivered to recipients at no cost or at a price below the market price[.]" Thus, if Serenity's rates were truly below the average market rates, the court could consider whether the difference constituted a gift or giving. However, the court is not convinced that the survey commissioned by Plaintiffs establishes the market rate. First, the court finds the sample problematic. The sample size was as low as six for the category of long-term residential treatment. Additionally, for some categories of treatment, the sample consisted of organizations such as Malibu Recovery Center and the Betty Ford Center, both of which are organizations with a reputation of opulence.[7] (*See* Def's Rebuttal Ex R1; Ptfs' Ex 10 at 6-9.) At best, the survey establishes the price difference between Serenity and other treatment centers. In fact, Asmuth testified that Serenity would not be able to charge the rates identified in the survey as average market. Plaintiffs report that the difference between Serenity's rates and the average market rate is a donation of over $6,600,000, an amount that is over 50 percent of Serenity's patient revenues. (Ptf's Ex 8 at 1.) For the court to conclude that such an amount constitutes a gift or giving, the organization or entity must prove the market price by a preponderance of evidence. Plaintiffs' have not met that burden; thus, the court finds that the reported amounts for lower-than-average market rates do not constitute a gift or giving.

Finally, Plaintiffs' contend that their approximately 2,800 hours of volunteer and community service hours constitute a gift or giving. The court accepts that figure but disagrees with the conclusion. First, the amount attributed to interns who receive a stipend or accreditation is not "volunteering" in the traditional sense because there is a degree of quid pro quo. Additionally, it is not clear whether the interns' tasks are dedicated to fee-paying patients or not;

---

[7] The sample also included Hazelden Springbrook Inc., a treatment center "founded to provide addicted professionals a high quality, effective recovery experience. * * *." *Hazelden*, WL 1237628 at *6 (May 11, 2004) (internal quotations omitted).

if intern time was used to support services for fee-paying patients, that time would not be considered a gift or giving. Additionally, for amounts attributed to Board member volunteer service, the court is not convinced that these efforts are purely charitable. There is a benefit that inures to a corporation that promotes its volunteer service. Although Asmuth testified that the volunteer time was not for the purpose of advertising, it is not uncommon for corporations to encourage their employees to volunteer in the name of the corporation in order promote name recognition and improve rapport with the public.

Finally, the court is now left to consider whether the cost to Serenity of providing the free trainings constitutes a gift or giving. Based on the evidence, these efforts amount to approximately $34,000 to almost $44,000, a minimal amount compared to patient revenues. (Ptfs' Ex 12 at 1-2.) Plaintiffs' have failed to establish that the dollar value of volunteer and community service time is sufficient to satisfy the gift or giving requirement.

### III. CONCLUSION

While Plaintiffs are undeniably involved in a worthwhile endeavor, the court is not persuaded that Plaintiffs are, in fact, charitable because the element of gift or giving is lacking. In the end, the court concludes that Plaintiffs are, at best, giving seven percent towards scholarships for those lacking the ability to pay and for subsidizing OHP recipients, an amount insufficient to constitute true gift or giving. Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that for the 2010-11 tax year, Plaintiffs appeal challenging the removal of tax exempt status for the property as identified as Accounts 1279098, 1480449, 0287274, 0287373, 0287290, and 1279106, is denied.

Dated this ___ day of March 2012.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on March 7, 2012. The Court filed and entered this document on March 7, 2012.*